**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Carl BAILEY, Defendant-Appellant.**

**No. 81–7610.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 19, 1982.

As Amended on Denial of Rehearing and Rehearing En Banc Jan. 10, 1983.

Mary S. Donovan, Federal Defender Program, Inc., Atlanta, Ga., for defendant-appellant.

Jake Arbes, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before GODBOLD, Chief Judge, and ANDERSON, Circuit Judges, and HOFFMAN *, District Judge.

R. LANIER ANDERSON, III, Circuit Judge:

This case is another in a long series of cases involving Drug Enforcement Administration ("DEA") agents and their police-citizen encounters at Atlanta's Hartsfield International Airport. Although we assume *arguendo* that the agents illegally arrested the defendant Carl Bailey, we hold that the cocaine and heroin found on Bailey's person were lawfully seized, and we therefore affirm Bailey's convictions.

## I. FACTS

Shortly after 5:00 A.M. on September 22, 1977, DEA Agent Michael Dorsett, while on duty at the Atlanta Airport, observed a black man, subsequently identified as the defendant Carl Bailey, disembark from a Delta Airlines flight from Los Angeles to Dallas to Atlanta. The DEA considers Los Angeles and Dallas to be source cities for the distribution of heroin and the Atlanta Airport to be frequently utilized by drug couriers. Bailey, who was carrying a blue tote shoulder bag, walked rapidly past several Delta ticket agents toward a bank of public telephones and began to place a telephone call. Agent Dorsett followed Bailey to the telephones, but after Bailey observed Agent Dorsett, Bailey returned to the main corridor of this wing of the terminal. At this point, Agent Dorsett noticed that Bailey conversed with another black male, subsequently identified as Larry Walker, who

was carrying a hanging clothes bag. Bailey and Walker began walking toward the Delta checkout point, but as they proceeded down the corridor they would drift apart by as much as ten or fifteen feet, come back together to exchange a few words, and then drift apart again. This conduct led Agent Dorsett to conclude that Bailey and Walker were attempting to conceal that they knew each other.

Bailey and Walker also were walking at an extremely slow pace, which, in Agent Dorsett's opinion, was a counter-surveillance technique intended to discover whether they were being followed. To avoid being uncovered, Agent Dorsett walked past Bailey and Walker, but he continued to monitor their activities. Bailey and Walker proceeded down an escalator toward the Delta baggage claim area. At this point, Agent Dorsett went to the local Atlanta police precinct and reported his observations to his supervisor, DEA Agent Paul Markonni.

When Agents Markonni and Dorsett arrived at the baggage claim area, they observed Walker standing next to a baggage conveyor belt and Bailey standing some twenty feet away near a telephone. Bailey and Walker left the baggage claim area without claiming any luggage and continued to maintain their distance. Bailey and Walker walked outside to the area for limousine and bus service and after a short while sat down on opposite ends of a large bench. This too was considered by the agents to be an attempt by Bailey and Walker to disguise that they knew each other.

The DEA agents surmised that Bailey and Walker knew that the agents were following them, and the agents decided to approach Bailey and Walker "to put their drug courier profile into effect." Record on Appeal, vol. I, at 165. Markonni and Dorsett identified themselves as federal narcotics agents and Agent Dorsett displayed his

---

* Honorable Walter E. Hoffman, U.S. District Judge for the Eastern District of Virginia, sitting by designation.

credentials. The agents asked Bailey and Walker for identification. Walker replied that he had no identification with him and Bailey produced a valid Georgia driver's license in the name of "Douglas Ray Holloway," which he gave to Agent Markonni. The agents noticed that Bailey appeared very nervous and that his hands were shaking when he produced the driver's license. Agent Markonni then asked to examine their airline tickets. Bailey looked at Walker and said that Walker had Bailey's ticket. Agent Markonni inquired whether Bailey and Walker were traveling together and Bailey falsely replied that the two had just met in Dallas. Walker produced the airline tickets which were in a single folder and sequentially numbered, indicating that the tickets had been purchased together, and handed the tickets to Markonni. One of the airline tickets was in the name of "Douglas Ray Holloway." The agents inquired why Walker was carrying Bailey's ticket if the two had just met in Dallas, but never received a satisfactory answer.

Agent Markonni then asked if Bailey and Walker would accompany the agents to the police precinct and consent to a search for narcotics. Both Bailey and Walker nervously replied in the affirmative to this request, and the four proceeded toward the nearest entrance to the terminal.

Almost immediately thereafter Bailey dropped his shoulder bag and fled across the airport with Markonni in hot pursuit. When Bailey climbed over a fence onto a service road, Markonni drew his service revolver and ordered Bailey to "stop or be shot." Bailey turned around, slowed, but did not stop and while still backing away from Markonni exclaimed, "I can't let you take me!" Markonni holstered his weapon and climbed over the fence in pursuit of Bailey. When Markonni reached Bailey, Bailey was attempting to climb over a gate. Markonni grabbed Bailey's leg, pulling Bai-

ley down from the gate. Bailey came down swinging, striking Markonni in the head. A struggle ensued and Markonni sensed that Bailey was reaching for Markonni's gun; although the gun came out of its holster, Markonni was able to retain control over it and to reholster it. Markonni and Bailey exchanged blows with their fists, and eventually Markonni, with the aid of a passing Delta airline employee, managed to subdue and handcuff Bailey. A search of Bailey at this time revealed a large sum of cash and a package containing what was later determined to be cocaine; a subsequent search conducted by Markonni back at the police precinct found in one of Bailey's pants pockets a package containing a substance subsequently identified as heroin.

Bailey moved to suppress the cocaine and heroin as the products of an illegal arrest and search. The motion was referred to a U.S. Magistrate who recommended that Bailey's motion to suppress be denied and the district court adopted the report and recommendation of the magistrate. After a bench trial on stipulated facts, the district court convicted Bailey on count one of possession with intent to distribute 8.2 grams of heroin, in violation of 21 U.S.C.A. § 841(a)(1) (West 1981), and on count two of simple possession of 3.4 grams of cocaine, in violation of 21 U.S.C.A. § 844(a) (West 1981). The district court sentenced Bailey to 15 years imprisonment followed by three years of special parole on count one, and one year imprisonment on count two to run concurrently with the sentence imposed on count one.[1]

## II. BAILEY'S FLIGHT AS PROVIDING PROBABLE CAUSE FOR A LAWFUL SECOND ARREST: FRUIT OF THE POISONOUS TREE ANALYSIS

 Assuming *arguendo* that the DEA agents illegally arrested Bailey,[2] we turn to

---

**1.** Bailey was originally charged with a third count under 18 U.S.C.A. § 111 (West 1969) for assaulting and resisting Agent Markonni while the latter was engaged in the performance of his official duties. The government, with leave of the court, voluntarily dismissed this third

count before Bailey's trial on the other two counts. Record on Appeal, vol. I, at 2, 177.

**2.** Unless Bailey's consent to accompany the agent to the police precinct for a search was voluntary, then under our recent en banc opin-

the question of whether the evidence Bailey seeks to suppress was obtained by exploitation of that illegal arrest—*i.e.,* a "fruit of the poisonous tree." When evidence is seized during a search of the person after an illegal arrest, it will be suppressed as the tainted product of the unlawful police action, unless the prosecution carries its burden of showing that the taint has been purged. *Brown v. Illinois,* 422 U.S. 590, 600–604, 95 S.Ct. 2254, 2260–2262, 45 L.Ed.2d 416 (1975); *United States v. Hill,* 626 F.2d 429, 437 (5th Cir. 1980); *United States v. Wynn,* 544 F.2d 786, 791 (5th Cir. 1977). The relevant inquiry examines the extent of the causal connection between the lawless police conduct and the evidence in question; *i.e.,* " 'whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (quoting R. Maguire, *Evidence of Guilt,* 221 (1959)). Although we find, as a factual matter, a close causal nexus between the illegal arrest at the terminal and Bailey's flight from the agents, and therefore the subsequent searches of his person, we nonetheless are compelled to uphold the searches that led to the discovery of the illicit drugs.

▬ As applied in a case such as this one, the fruits doctrine generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response. A sufficient causal connection to justify exclusion of the evidence, however, is not established merely because "but for" the illegal police conduct the defendant would not have responded as he did. *Dunaway v. New York,* 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979); *United States v. Fike,* 449 F.2d 191, 193 (5th Cir. 1971). The government may defeat a motion to suppress by demonstrat-

ing a break in the causal chain. *See United States v. Fike,* 449 F.2d at 193. Three exceptions to the exclusionary rule of the fruits doctrine thus have been developed. First, intervening events or circumstances independent of the primary illegality may have so attenuated the causal connection as to dissipate the taint of the unlawful police action. *E.g., United States v. Ceccolini,* 435 U.S. 268, 279–80, 98 S.Ct. 1054, 1061–62, 55 L.Ed.2d 268 (1978); *United States v. Berry,* 670 F.2d at 604–05. Second, the government may use evidence that it has obtained in fact from a source independent of the primary illegality. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *United States v. Ible,* 630 F.2d 389, 393–94 (5th Cir. 1980). Third, evidence may be admissible if the government inevitably would have discovered it without the aid of the unlawful police conduct, pursuant to the limited version of the "inevitable discovery" rule defined for this circuit in *United States v. Brookins,* 614 F.2d 1037, 1042 n. 2, 1044–49 (5th Cir. 1980). *United States v. Wilson,* 671 F.2d 1291, 1294 (11th Cir. 1982). *See Brewer v. Williams,* 430 U.S. 387, 406 n. 12, 97 S.Ct. 1232, 1243 n. 12, 51 L.Ed.2d 424 (1977).

While a "but for" connection between the unlawful police conduct and the defendant's response will not in itself establish the requisite causal link, neither will an act by a defendant, which may in some sense be considered "voluntary," necessarily break the causal chain. In *Dunaway v. New York, supra,* and *Brown v. Illinois, supra,* the Supreme Court held that although a confession may be "voluntary" for Fifth Amendment purposes, voluntariness is only a threshold test for the Fourth Amendment, and even a voluntary confession will be suppressed if it is the product of an unlawful arrest and custodial detention. This circuit and the former Fifth Circuit have held that a defendant's voluntary consent to be searched, obtained after the defendant had been illegally arrested but also

ion, *United States v. Berry,* 670 F.2d 583 (5th Cir. 1982), it would be tantamount to an arrest

requiring probable cause.

after the defendant had been advised of his right to refuse to be searched, will not in itself dissipate the taint of the unlawful arrest. *United States v. Robinson,* 690 F.2d 869 at 877 (5th Cir. 1982; *United States v. Robinson,* 625 F.2d 1211 at 1219–20 (5th Cir. 1980); *United States v. Wilson,* 569 F.2d 392, 395–97 (5th Cir. 1978). Similarly, in *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), the Court ruled that a defendant's testimony in a prior trial could not be used against him in his retrial because the defendant had been prompted to testify at the prior trial by the introduction by the prosecution of illegally obtained evidence. Responding to the government's arguments that the defendant had made a "tactical choice" to testify and that factors other than the introduction of the illegally obtained evidence motivated the defendant to testify, the court commented:

> It is, of course, difficult to unravel the many considerations that might have led the petitioner to take the witness stand at his former trial. But, having illegally placed his confessions before the jury, the Government can hardly demand a demonstration by the petitioner that he would not have testified as he did if his inadmissible confessions had not been used. "The springs of conduct are subtle and varied," Mr. Justice Cardozo once observed. "One who meddles with them must not insist upon too nice a measure of proof that the spring which he released was effective to the exclusion of all others." Having "released the spring" by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony.

*Id.* 392 U.S. at 224–25, 88 S.Ct. at 2011 (footnotes omitted).

To the same effect are the former Fifth Circuit decisions concerning the abandonment of property by a defendant during an encounter with the police. In *United States v. Beck,* 602 F.2d 726 (5th Cir. 1979), the defendant tossed a marijuana cigarette and some narcotics paraphernalia out of the window of his parked car after he and a passenger had been illegally stopped by the police. A subsequent search of Beck's car revealed two packages stolen from the United Parcel Service, which formed the basis of Beck's convictions for possessing items stolen from an interstate freight shipment. Although the district court held that, despite the illegal stop, the abandoned property gave the officer probable cause to arrest Beck and search his car, the former Fifth Circuit suppressed all of the evidence as the fruit of the initial unlawful arrest. The abandoned items did not provide "untainted probable cause to maintain Beck in custody, arrest the passenger, and search the car . . . [because] the abandoned contraband was itself the product of unlawful police action . . . ." *Id.* at 728. The court further noted that "it would be sheer fiction to presume . . . [the acts of abandonment] were caused by anything other than the illegal stop." *Id.* at 730. *Accord United States v. Lara,* 638 F.2d 892, 895 (5th Cir. 1981) (Dictum rejecting the district court's finding of no nexus between allegedly illegal arrest and disclaimer of ownership (*i.e.,* abandonment) of tote bag); *United States v. Maryland,* 479 F.2d 566, 568 (5th Cir. 1973) ("The nexus between the arrest and the discovery of the evidence is strong in this case, for the arrest obviously motivated the defendant to attempt to conceal the bills in the police vehicle"); *Lawrence v. Henderson,* 478 F.2d 705, 708 (5th Cir. 1973) ("If it is assumed that Lawrence possessed the narcotics paraphernalia at one time, the facts make clear that the illegal arrest prompted him to conceal it in the police vehicle"); *Fletcher v. Wainwright,* 399 F.2d 62, 64–65 (5th Cir. 1968) (That stolen jewelry was found in a public area was irrelevant and did not render the search outside of the Fourth Amendment because the jewelry had been thrown out of a motel window into the courtyard in response to an illegal entry into the defendant's motel room).[3]

---

**3.** Although there is some language in some of these opinions referring to whether or not the abandonment was "voluntary," the reasoning

*Dunaway* and ·*Brown* have set forth several factors which are relevant to determining whether the defendant's behavior was a product of the illegal police action. The relevant factors include the temporal proximity of the arrest and the defendant's response, the presence or absence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *See* 442 U.S. at 218, 99 S.Ct. at 2259; 422 U.S. at 603–04, 95 S.Ct. at 2261–62. *As a factual matter,* we can perceive no difference [4] between this case and the aforementioned cases in the *strength* of the causal connection between the evidence obtained and the illegal [5] police conduct. Bailey's flight was in fact no less a product of lawless police conduct than was, for example, the testimony in *Harrison* or the tossed marijuana in *Beck.* Bailey fled moments after the illegal arrest and nothing intervened between his arrest and flight. As in *Brown* and *Dunaway,* the "arrest, both in design and in execution, was investigatory." 422 U.S. at 605, 95 S.Ct. at 2262. The agents admittedly approached Bailey "to put their drug courier profile into effect," Record on Appeal, vol. I, at 165, and the purpose for his arrest without probable cause in these circumstances can only be "an expedition for evidence in the hope that something might turn up." 422 U.S. at 605, 95 S.Ct. at 2262. We cannot say that Bailey's flight in the face of and only after his illegal arrest represents "a mere coincidental decision" to run unrelated to the police conduct; "it would be sheer fiction to presume . . . [that Bailey's flight was] caused by anything other than the illegal stop." *United States v. Beck,* 602 F.2d at 730. *See Wong Sun v. United States,* 371 U.S. at 484, 83 S.Ct. at

415; *United States v. Coleman,* 450 F.Supp. 433 (E.D.Mich.1978).

Despite the close causal nexus in fact between Bailey's arrest and flight, the government nevertheless argues that Bailey's flight from and struggle with Agent Markonni provided probable cause for a second, lawful arrest of Bailey for forcibly resisting the first, albeit unlawful, arrest. *See* 18 U.S.C.A. § 111 (West 1969).[6] The searches that uncovered the illicit drugs in Bailey's possession were thus incident to this second, lawful arrest. In support of this position, the government cites *United States v. Nooks,* 446 F.2d 1283 (5th Cir.), *cert. denied,* 404 U.S. 945, 92 S.Ct. 299, 30 L.Ed.2d 261 (1971), and *United States v. Garcia,* 516 F.2d 318 (9th Cir.), *cert. denied,* 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1975).

In *Nooks,* the car driven by one of the defendants, John Henry Brown, was stopped and the defendant was arrested. Although the Fifth Circuit panel never ruled on the lawfulness, *vel non,* of that arrest, the court assumed for the purposes of the appeal that the arrest was illegal. The defendant was told to drive his car to a specified location while the arresting sheriff followed in a patrol car. Another officer in a third car subsequently joined this procession and led the defendant followed by the sheriff toward their destination. Before arriving at their destination, however, the defendant's car turned sharply and quickly accelerated away from the police cars. A chase ensued which reached speeds up to 115 m.p.h. before the defendant was recaptured. During the chase, the defendant fired three shots at the sheriff. The court

---

and authority on which these cases rely make clear that causation is the critical inquiry.

4. There is, however, a difference between this case and those cited in the above text in the character of the defendant's response (but not in its causal antecedents) and in the legal significance of this characterization which, of course, provides the basis for our affirmance of Bailey's convictions. *See, infra.*

5. We have assumed *arguendo* that Bailey's arrest was illegal.

6. 18 U.S.C.A. § 111 (West 1969) provides:

Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

noted that parties had focussed their argument on the validity of the initial arrest when the sheriff first stopped the car. The court, however, focussed on the second arrest:

> Much, however, intervened between that time and the search of the automobile, including the following: (1) Dye heard from Sheriff Compton that Brown's description fitted the description of one of the robbers of the Bank of Stapleton. (2) Brown precipitately and forcibly attempted to escape from Dye's custody and fled driving at speeds up to 115 m.p.h. (3) During that flight, he shot directly at Sheriff Dye. (4) The presence of two other men in the trunk of the automobile was unmistakably revealed both visually and audibly.
>
> Before the trunk of the automobile was opened, it had become academic whether Brown's original arrest was lawful or not. Brown's description and his precipitate flight had furnished additional evidence to show probable cause for his arrest and for the search of the automobile. *Further, Brown had committed another crime by shooting directly at Sheriff Dye* . . . . Under the circumstances known at the time of the actual search of the automobile, there can be no doubt as to the validity of that search. The nexus between that search and Brown's original arrest had been attenuated. The fruits of that search cannot realistically be treated as fruits of Brown's original arrest. We need not, therefore, pass judgment on the lawfulness, vel non, of that arrest.
>
> We hold simply that, *at the time the trunk of the automobile was opened* and the automobile was searched, *probable cause existed for the arrest of all three,* Brown, Nooks and Hughes; the search of

the automobile incident to *that arrest* was "reasonable"; and the relevant fruits of that search were admissible in evidence.

446 F.2d at 1287–88 (footnotes omitted) (emphasis added). The court in *Nooks* did not specify whether the taint from the original arrest had been attenuated *as a factual matter*[7] or because of the policy reasons we discuss *infra.* Assuming the former, *Nooks* nevertheless is illustrative of the sort of circumstances where a lawful second arrest may follow an unlawful first arrest. Moreover, because the flight itself in *Nooks* was so directly and immediately related to—*i.e.,* caused by—the original unlawful arrest, we suggest that the policy reasons articulated here provide the most satisfactory rationale for the *Nooks* holding.[8]

In *Garcia,* the defendant drove past, without slowing down, a fixed checkpoint operated by the United States Border Patrol on an interstate highway. The Border Patrol agents chased the defendant at speeds reaching 70 m.p.h. before finally arresting the defendant and finding contraband in a search of his car. The Ninth Circuit, "assuming the stop at the fixed checkpoint to be illegal," 516 F.2d at 319, nonetheless upheld the arrest and search because of the defendant's flight. *Id.* at 319–20. Ninth Circuit decisions since *Garcia,* however, have circumscribed the scope of that case by highlighting the precipitant, erratic, and illegal character of the flight in *Garcia. See United States v. Morrison,* 546 F.2d 319, 320 (9th Cir. 1976); *United States v. Ogilvie,* 527 F.2d 330, 332 (9th Cir. 1975).

■ Reading these cases in conjunction with the law cited in our general discussion of the fruits doctrine, *supra,* we conclude that notwithstanding a strong causal connection in fact between lawless police conduct and a defendant's response, if the de-

---

7. The defendant's means of escaping in *Nooks* (*i.e.,* high speed flight in an automobile and shooting at a policeman) may have been so wanton and outrageous as to have attenuated *as a factual matter* the causal relation between the illegal police conduct and the defendant's flight.

8. Regardless of the rationale, *Nooks* provides support for our holding today. The flight in *Nooks* is hardly distinguishable from Bailey's flight. It is true that the firing of shots in *Nooks* is more egregious than Bailey's struggling with Markonni. However, only a reasonable expansion of the *Nooks* holding is necessary to encompass the instant case.

fendant's response is itself a new, distinct crime, then the police constitutionally may arrest the defendant for that crime. Cases such as *Beck* are distinguishable from this case (and *Nooks* and *Garcia*) because in *Beck* the defendant's *response* to the illegal police conduct (*i.e., tossing* the marijuana out of the car window) was not itself a new, distinct crime. The defendant in *Beck* was in possession of the marijuana before the police misconduct occurred and his response to the misconduct only revealed this extant crime and did not itself constitute a crime— *i.e.,* tossing marijuana is not a crime, possessing it is. If a noncriminal act that merely *reveals* a crime that has been or is being committed by the time of the official misconduct constituted the basis for an exception to the fruits doctrine, then cases such as *Beck* and *Dunaway* would have been resolved differently.

In contrast, where the defendant's response is itself a new, distinct crime, there are strong policy reasons for permitting the police to arrest him for that crime. A contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct. Where the police misconduct is particularly egregious, many serious crimes might plausibly be the product of that misconduct. For example, if the police illegally fired warning shots at a person, would that person be shielded from arrest and prosecution if he fired back and killed someone? *Cf. Bad Elk v. United States,* 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874 (1900) (suggesting that a defendant who in resisting an unlawful arrest used an unreasonable amount of force and killed the arresting officer might be guilty of manslaughter but not murder). Or would a person be justified if he seized an innocent hostage as a human shield to protect himself from wrongful police fire? Unlike the situation where in response to the unlawful police action the defendant merely reveals a crime that *already* has been or is being committed, extending the fruits doctrine to immunize a defendant from arrest for *new* crimes gives a defend-ant an intolerable *carte blanche* to commit further criminal acts so long as they are sufficiently connected to the chain of causation started by the police misconduct. This result is too far reaching and too high a price for society to pay in order to deter police misconduct. The Supreme Court has clearly directed that the attenuation analysis be informed by "considerations relating to the exclusionary rule and the constitutional principles which it is designed to protect." *United States v. Ceccolini,* 435 U.S. 268, 279, 98 S.Ct. 1054, 1061, 55 L.Ed.2d 268 (1978); *Brown v. Illinois,* 422 U.S. at 602, 95 S.Ct. at 2261. The *Ceccolini* Court said:

> [T]hat the question of causal connection in this setting ... is not to be determined solely through the sort of analysis which would be applicable in the physical sciences. The issue cannot be decided on the basis of causation in the logical sense alone, but necessarily includes other elements ... [relating to] the fundamental tenets of the exclusionary rule.

435 U.S. at 274, 98 S.Ct. at 1059. In *Ceccolini,* the Court weighed the costs to society of excluding the live testimony at issue in that case, *id.* 435 U.S. at 277–78, 98 S.Ct. at 1060–61, and considered whether a decision admitting the evidence would provide additional incentive to police to conduct illegal searches. *Id.* 435 U.S. at 276, 98 S.Ct. at 1060. To apply the exclusionary rule here where there has been a new and distinct crime and a legal arrest would exact from society a cost even greater than that involved in *Ceccolini.* Nor can we perceive that the rule we announce today will encourage illegal police conduct. Certainly instances of forcibly resisting arrest are rare, and could hardly be counted on by police to resurrect an otherwise invalid arrest. Moreover, sound policy reasons obviously argue that the law should discourage and deter the incentive on the part of potential arrestees to forcibly resist arrest or to commit other new and separate crimes. Accordingly, we conclude that the police may legally arrest a defendant for a new, distinct crime, even if the new crime is in

response to police misconduct and causally connected thereto.[9]

■ If the police lawfully have arrested a suspect, then they may properly conduct incident to that custodial arrest a full search of the person. *Gustafson v. Florida,* 414 U.S. 260, 266, 94 S.Ct. 488, 492, 38 L.Ed.2d 456 (1973); *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 476, 38 L.Ed.2d 427 (1973).[10] Such a search is reasonable under the Fourth Amendment in order to protect the police and others from any concealed weapons the suspect may have, to prevent the destruction of evidence by the suspect, and to prevent the suspect from retaining contraband (*e.g.,* drugs) while in custody. All of these considerations apply with full force even when the lawful arrest followed an unlawful one. We see no reason to disturb the well-settled principle that a lawful search may be made incident to a legal arrest.

Critical to the disposition of this case, therefore, is whether Bailey had a right to flee and to resist his unlawful arrest as he did. If Bailey had such a right, then his response to the illegal arrest was lawful and under the fruits doctrine and the *Beck* line of authority his flight could not provide untainted probable cause to rearrest him. If Bailey had no such right, then his response was unlawful and a new, distinct crime under 18 U.S.C.A. § 111; under *Nooks* and the rationale delineated above, he could validly be rearrested for resisting arrest.

The common law recognized the right of a citizen to use reasonable force to resist an unlawful arrest. *E.g., Bad Elk v. United States, supra.* The common-law rule, however, has been greatly eviscerated, if not virtually abolished, in this circuit. *United States v. Danehy,* 680 F.2d 1311, 1315–16 (11th Cir. 1982). In *Danehy,* the defendant in response to a warrantless arrest, which he believed to be illegal, passively resisted by "going limp" and thereby forced the arresting Coast Guard officers to carry him off his boat.[11] A panel of this court, assuming for the purposes of the appeal that Danehy's arrest was unlawful, 680 F.2d at 1315, affirmed the district court's refusal to deliver a jury instruction requested by Danehy on the common-law right to resist an unlawful arrest. The panel stated, "the common-law right to resist an arrest that is not based upon probable cause, suited though it may have been to a past era, has no significant role to play in our society where ready access to the courts is available to redress such police misconduct." *Id.* at 1316.

■ If Danehy had no right to resist passively by "going limp" and could be prosecuted under 18 U.S.C.A. § 111 for this, then *a fortiori,* Bailey had no right to flee and to strike Agent Markonni in an effort to escape Markonni's attempts to recapture him. Under *Danehy,* probable cause existed for Bailey's second arrest for resisting arrest and thus Agent Markonni could validly arrest Bailey. The search of Bailey that discovered the illicit drugs was a law-

**9.** We are not confronted here with any suggestion that agents Markonni and Dorsett intentionally provoked Bailey's flight or that the agents otherwise generated the second, resisting arrest crime as a pretext to provide an independent, legitimate basis for the prior illegal arrest. Of course, we would not tolerate that, and we are satisfied that courts will be alert to discern such abuses.

**10.** The subsequent search conducted when Bailey was taken back to the police precinct at the airport, which search uncovered the heroin, is also a search incident to the arrest. *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *United States v. Sonntag,* 684 F.2d 781 (11th Cir. 1982).

**11.** This is Danehy's version of the facts; the officers claimed that Danehy resisted by ramming one of the officers into a bulkhead and by

kicking at the Coast Guardsman. Since the legal issue in *Danehy* was whether the district court erred in not giving the defendant's requested jury instruction on the right to resist an unlawful arrest, the appellate court must have assumed Danehy's version of the facts for the purposes of the appeal. *See, e.g., United States v. Young,* 464 F.2d 160, 164 (5th Cir. 1972) ("'the defendant is entitled to have presented instructions relating to a [valid] theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility.'") (quoting *Tatum v. United States,* 190 F.2d 612, 617 (D.C.Cir.1950)). The court could not have rejected Danehy's requested instruction by resolving the factual dispute against him; the court must have determined that even under Danehy's version of the facts, he had no right to resist the officers and thus the instruction did not state a valid defense to the charges.

ful search incident to the lawful second arrest.[12]

### III. RESIDUAL MATTERS

Bailey also challenges the district court's denial of his motion to inspect and for independent expert analysis of the seized drugs. Bailey has not stressed this point on appeal and we find it without merit. This request was untimely by several months and as such the district court did not abuse its discretion in denying the motion.

Lastly, there appears to be a typographical error in the Judgment Order. The district court in its memorandum order clearly acquitted Bailey of possession of cocaine with intent to distribute and convicted Bailey of the lesser included offense of simple possession.[13] Both parties in their respective briefs acknowledge that Bailey was only convicted of the lesser included offense of simple possession of cocaine on count two. Brief of Appellant at 4; Brief of Appellee at 3. The Judgment Order reads, "Defendant has been convicted as charged of the offense(s) of ... possessing with intent to distribute a Schedule II controlled stbstance [sic], that is, a quantity of cocaine, in violation of Title 21, United States Code, Section 841(a)(1), as charged in count two." This is plain error of which this court may take cognizance. On remand, the district court is instructed to reform the Judgment Order to record accurately the offenses for which Bailey was convicted.

### IV. CONCLUSION

Although we assume *arguendo* that the DEA agents initially unlawfully arrested Bailey, we nonetheless uphold the searches of his person as incident to a lawful second arrest for resisting arrest. Bailey's appeal from the denial of a motion to suppress is without merit. A remand, however, is appropriate to correct an apparent typographical error in the Judgment Order.

AFFIRMED AND REMANDED WITH INSTRUCTIONS.

---

**12.** *Wong Sun v. United States, supra,* and *United States v. Coleman, supra, cited in, United States v. Beck,* 602 F.2d at 730, are not to the contrary. Neither of those cases considered the argument, made by the government here and on which this opinion relies, that the defendant's flight provided probable cause to arrest the defendant for resisting arrest. Moreover, the pure flight involved in both of those cases, as contrasted with Bailey's physical struggles with Agent Markonni, may not have been enough to provide grounds for arresting under 18 U.S.C.A. § 111. To violate that section, the defendant must resist "forcibly." *Wong Sun* also considered the flight there to be "ambiguous conduct" because the defendant reasonably may not have known or believed that the persons pursuing him were truly law enforcement officials. 371 U.S. at 482–84, 83 S.Ct. at 414–15. *Reid v. Georgia,* 448 U.S. 438,

100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), similarly did not address the issues resolved here.

**13.** The relevant portion of the district court's memorandum opinion states:

The amount of cocaine which Bailey had, 3.4 grams, had a street value of approximately $80 and is not such an amount that would raise the inference that he was carrying the cocaine for distribution rather than personal use. Consequently, the court finds that there is insufficient evidence to find Bailey guilty of possession of cocaine for distribution. For the foregoing reasons, the court finds the defendant guilty as to count 1 and guilty of the lesser included offense of simple possession under count 2 of the indictment.

Record on appeal, vol. I, at 231–32.