*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-839

JERMAL E. JOHNSON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF2-15610-16)

(Hon. Danya A. Dayson, Trial Judge)

(Argued February 7, 2019                    Decided July 15, 2021)

*Steven R. Kiersh* for appellant.

*Jessie K. Liu*, United States Attorney at the time the brief was filed, with whom, *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Eric Hansford*, and *Ann M. Carroll*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, MCLEESE, *Associate Judge,* and FISHER,[*] *Senior Judge.*

Opinion for the court by *Chief Judge* BLACKBURNE-RIGSBY.

Concurring opinion by *Chief Judge* BLACKBURNE-RIGSBY at page 23.

Concurring opinion by *Associate Judge* MCLEESE at page 24.

---

[*] Judge Fisher was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on August 23, 2020.

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant Jermal Johnson appeals the partial denial of his motion to suppress an unregistered firearm and ammunition that he discarded while fleeing on foot from law enforcement after an unlawful pat-down.[1]  In denying his motion to suppress, the trial court ruled first in appellant's favor that the officer conducted an unlawful pat-down.  However, it found that appellant's subsequent flight ended any seizure, thereby removing the taint of the unlawful seizure from the subsequently-discarded and discovered firearm and ammunition.  The only question before this court is whether appellant's flight operated to attenuate the illegal prior frisk, thereby permitting the admission of the subsequently recovered gun into evidence.  Applying the attenuation doctrine to the facts of this case, we find no attenuating or intervening circumstances here and reverse appellant's firearm-related convictions.[2]

---

[1]  A jury convicted appellant of (1) unlawful possession of a firearm, committed after a prior felony conviction, D.C. Code § 22-4503(a)(1) (2012 Repl.); (2) carrying a pistol without a license, D.C. Code § 22-4504(a) (2012 Repl.); (3) possession of an unregistered firearm, D.C. Code § 7-2502.01(a) (2018 Repl.); (4) unlawful possession of ammunition, D.C. Code § 7-2506.01(3) (2018 Repl.); and (5) unlawful entry, D.C. Code § 22-3302 (2012 Repl.).

[2]  On appeal, appellant does not challenge his unlawful entry conviction.  See *supra* note 1.

## I.      Factual and Procedural History

At the hearing on the appellant's motion to suppress, the government introduced evidence that, at approximately 5:30 p.m. on September 23, 2016, Metropolitan Police Department ("MPD") Officers Anthony Brathwaite and Patrick Bacon were on patrol in a marked patrol car in a "high-crime area" that included the Edgewood apartment complex and the surrounding area in the District of Columbia's Northeast quadrant. Specifically, Officer Brathwaite testified it was a known high-crime area. The officers observed a white BMW, which they believed was leaving the apartment complex, fail to come to a complete stop behind the stop line at a stop sign.[3] As a result, the officers conducted a traffic stop of the BMW at the 300 block of Channing Street, Northeast. The officers approached the BMW on either side of the vehicle and observed the driver and three passengers inside. An individual, later identified as appellant, occupied the front passenger seat. Officer Brathwaite noticed the driver was "shaky . . . [h]is hands were shaking. And even the way that he was talking, it gave off a nervous vibe." Officer Brathwaite did not know the driver, appellant, or any of the other occupants.

---

[3] Under 18 D.C.M.R. § 2208.3, "every driver of a vehicle approaching a stop sign shall stop at a clearly marked stop line."

Officer Brathwaite asked the driver to step out of the vehicle to speak with the officer. The driver complied. The officer observed that all of the occupants in the vehicle were nervous, and as a result, asked if he could search the vehicle. The driver consented to a search of his vehicle, and all occupants exited the vehicle one-by-one. Because Officers Brathwaite and Bacon were outnumbered by the car's occupants, two other officers arrived to assist. Because appellant appeared nervous and Officer Brathwaite wanted to ensure the safety of the public and the officers, he asked appellant if he could conduct a pat-down of appellant's person.[4] According to Officer Brathwaite, in response, appellant "put his hands up," which the officer understood to be implied consent. The officer conducted a pat-down and felt a metal object on the right side of appellant's right leg, which he believed to be a gun. Instead of placing him in handcuffs per the officer's usual practice, he asked appellant what the object was. Appellant responded: "That's my thing." Moments later, appellant fled on foot. While Officers Brathwaite and Takim Jackson, who had arrived to assist the traffic stop, pursued him on foot, Officer Brathwaite heard

---

[4] Officer Brathwaite explained the officers conducted a pat-down of all the occupants. He could not recall if he patted down the driver. At this point, the officers had not conducted a search of the vehicle or found any contraband.

a metal object fall to the ground in the street, but ran past it in pursuit of appellant.[5] Officer Brathwaite was less than a half car-length behind appellant when he heard the metal object hit the ground and continued to chase appellant while Officer Jackson recovered the object, which was a loaded handgun. Officer Brathwaite did not observe anyone attempt to reclaim the metal object.

Officer Jackson testified that he saw appellant running with his right hand at his waist and his left hand "pump[ing] freely" and when the officer was two or three car-lengths behind appellant, he saw a gun fall from appellant's waistband on his right side and land under a nearby car. Officer Bacon continued the chase by car and witnessed appellant run through the screen door of a nearby house on the 400 block of Bryant Street, Northeast. Officer Bacon followed appellant into the house and apprehended him in the kitchen.

Appellant denied consenting to a pat-down or search of his person. Appellant further clarified that he did not raise his hands in the air at any point or make any

---

[5] Not until after the officers took appellant into custody did Officer Brathwaite see the firearm, but Officer Jackson announced it over the police radio. He also testified the object he heard fall was on appellant's person and ended up on the street.

physical movement immediately after exiting the vehicle. Instead, as soon as he exited the vehicle, the officer proceeded to pat him down.[6] According to appellant, he did not have anything metal on his person; however, he wore a court-ordered device on his right ankle. He also denied throwing any objects. Appellant did not know the officers.

Appellant moved to suppress the gun and ammunition found by Officer Jackson, arguing that the officers did not conduct a valid traffic stop and that he was illegally seized when Officer Brathwaite patted him down without his consent. At the suppression hearing, appellant's counsel argued that, but for the officer's unlawful conduct, he would not have been frisked by the officers, nor would he have fled from them. The trial court partially granted appellant's motion to suppress. The trial court suppressed the evidence that appellant consented to the pat-down and that he subsequently abandoned the gun. In doing so, the trial court found that the officer conducted a valid traffic stop, the driver consented to a search of the car, and appellant lacked standing to object to the search of the car. Thus, the officer did not seize appellant when he ordered him out of the car; instead, he merely facilitated the consent search of the car. However, the trial judge found that appellant was

---

[6] Appellant denied placing his hands in the air.

unlawfully seized because he did not consent to Officer Brathwaite's pat-down, and there was no other constitutional basis for the pat-down. *See Terry v. Ohio*, 392 U.S. 1, 21-22 (1968); *see also Germany v. United States*, 984 A.2d 1217, 1222 (D.C. 2009) (holding if a police officer has reasonable, articulable suspicion that an individual "might be armed and dangerous," the officer may lawfully pat-down (frisk) that individual) (footnote omitted). The trial court further found that appellant "discarded an item that was later found to be gun," [7] supporting the trial court's conclusion that appellant intended to abandon it. Relying on *Henson v. United States*,[8] the trial court held in the alternative that, based on appellant's flight and

---

[7] Although none of the officers testified they saw appellant discard the gun, appellant does not challenge in his brief the trial court's finding that he discarded the gun. Accordingly, for purpose of this appeal, we need not question the trial court's finding, which is reasonable based on the evidence presented. Furthermore, to the extent that the United States is arguing that appellant may not rely on the trial court's finding because he took a different position in the trial court, the United States fails to cite authority supporting a conclusion that a party is foreclosed from relying on appeal on factual findings made by the trial court that are contrary to the party's factual position in the trial court. We see no reason to preclude such reliance, *cf., e.g., Banks v. United States*, 516 A.2d 524, 530-31 (D.C. 1986) (although defendant testified at trial that he had not sold heroin, jury found otherwise, and defendant was permitted to rely on that finding to argue for leniency at sentencing on ground that he had sold heroin to support addiction).

[8] On March 25, 2021, the Supreme Court issued a decision in *Torres v. Madrid*, 141 S.Ct. 989 (2021), that rejects some of our reasoning in *Henson*, holding instead that the application of physical force to the body of a person with intent to restrain is a Fourth Amendment seizure even if the person does not submit and is not

decision to abandon the loaded gun, appellant lacked standing to seek exclusion of the loaded gun on Fourth Amendment grounds.[9]  55 A.3d 859, 866 (D.C. 2012) ("There is no need for an individual to resort to flight to protect his or her rights."). The jury ultimately convicted appellant on all counts.  Appellant appeals the partial denial of his suppression motion.

On appeal, appellant argues that the factors to support seizing the appellant in *Henson*—"(1) appellant's unprovoked flight from the officers, (2) at night, (3) in a high crime area, (4) after the officers indicated that they were interested in investigating recent robberies in the area and that they wanted to know if appellant had weapons on him"—are not present here.  *Henson, supra*, 55 A.3d at 867. However, these factors only support the trial court's ruling that the officer conducted an unlawful pat-down.  In his brief, appellant did not address whether his flight operates to attenuate the illegal prior frisk, which would permit the admission of the gun into evidence.  Our review of the record and the government's brief also shows that the government did not explicitly raise the attenuation issue in the trial court, but appellant's counsel argued its general principles.  Consequently, for oral

---

subdued.  This ruling, however, does not impact our analysis of the reasonable suspicion issue.

[9] We discuss this standing argument and why it fails *infra* at Part III.

argument, we directed the parties to be prepared to discuss *Utah v. Strieff*, 136 S. Ct. 2056 (2016), and *Thornton v. State*, 189 A.3d 769 (Md. Ct. Spec. App. 2018) (applying the attenuation doctrine to an unlawful pat-down of a driver during a traffic stop and affirming the denial of motion to suppress a firearm discovered as a direct result of driver's flight).[10]

## II.    Attenuation Doctrine Analysis

In reviewing the trial court's denial of a suppression motion, "we view the evidence presented at the suppression hearing in the light most favorable to the prevailing party . . . [and] draw all reasonable inferences in that party's favor." *Henson*, 55 A.3d at 863 (cleaned up).  While we review the factual findings for clear error and "'give due weight to inferences drawn from those facts by resident judges and local law enforcement officers,'" *id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)), we review the legal conclusions drawn from those findings, de

---

[10]    Subsequent to oral argument, the Court of Appeals of Maryland reversed the appellate decision.  *See Thornton v. State*, 214 A.3d 34, 57 (Md. 2019) (reversing appellate court's holding and concluding that the driver's flight was a direct result of police officer's unlawful pat-down and therefore the trial court erred in denying the motion to dismiss).

novo. *Miles v. United States*, 181 A.3d 633, 637 (D.C. 2018) (internal citation omitted).

"Generally, when physical or testimonial evidence is uncovered by an illegal search or seizure, it must be suppressed as the 'fruit of the poisonous tree.'" *Wilson v. United States*, 102 A.3d 751, 753 (D.C. 2014) (citation omitted). This exclusionary rule applies unless the government proves that "the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstances so as to remove the 'taint' imposed upon that evidence by the original illegality." *Gordon v. United States*, 120 A.3d 73, 85 (D.C. 2015) (quoting *United States v. Crews,* 445 U.S. 463, 471 (1980)).

The Supreme Court has long recognized the so-called attenuation doctrine and articulated three factors to guide the analysis. *See Utah v. Strieff*, 136 S.Ct. 2056 (2016); *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975). In *Brown*, the Supreme Court announced that we should consider "in determining whether the primary taint of illegal police conduct has been purged: (1) the temporal proximity of the illegal seizure and the discovery of the contraband; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Id.*; *accord Strieff*, 136 S.Ct. at 2061-62. "The relative importance of each of these

factors in any particular case of course depends on the circumstances of that case." *United States v. McMillian*, 898 A.2d 922, 940 (D.C. 2006) (quoting *United States v. Cherry*, 759 F.2d 1196, 1211 (5th Cir. 1985)). Analyzed collectively under the circumstances here, the three factors favor appellant.

### 1. *Temporal Proximity*

Here, the first factor, temporal proximity, weighs in favor of appellant. Appellant fled on foot mere moments after the officer conducted the unlawful pat-down, and the officers recovered the gun after a short pursuit. *See Strieff*, 136 S.Ct. at 2062 (involving the discovery of drugs "only minutes" after the illegal stop and concluding this favors suppression of the evidence); *Thornton*, 214 A.3d at 57 (favoring suppression when "mere moments" passed between the unlawful frisk and the discovery of the handgun); *see also e.g., Green v. United States*, 231 A.3d 398, 413 n.52 (D.C. 2020) (recognizing that suppression is favored when very little time has passed between an officer's unlawful conduct and the recovery of evidence); *cf. Oliver v. United States*, 656 A.2d 1159, 1173 (D.C. 1995) (finding the primary taint purged where at least three hours passed between the unlawful arrest and the confession). Because the time encompassing the chain of events was mere moments, the temporal proximity factor strongly favors appellant.

## 2. Intervening Circumstances

The second factor, the presence of intervening circumstances, likewise has no purgative effect. Although appellant was a passenger in a vehicle that was the subject of valid traffic stop, it is undisputed that Officer Brathwaite lacked reasonable articulable suspicion to conduct a lawful pat-down of appellant. Appellant's flight, moments later, was the direct result of this unlawful pat-down.[11] *See Hicks v. United States*, 705 A.2d 636, 641 (D.C. 1997) (refusing to find an intervening circumstance where the officer's discovery of the contraband was "virtually simultaneous" with the illegal arrest).

The government argues that a defendant's flight and voluntary abandonment of contraband necessarily purges any taint from an unlawful search or seizure. We are not persuaded. As the government has shown in its brief, there are some cases where courts have found attenuation in a defendant's response to illegal police conduct. In those decisions cited by the government, the courts found that the

---

[11] Although, as the government points out, appellant did not explicitly testify that the pat-down prompted his flight, we find that this reasonable inference is implicit in the trial court's ruling.

defendant had either committed a new crime, e.g., *United States v. Garcia*, 516 F.2d 318, 319 (9th Cir. 1975) (resisting arrest); *See United States v. Brodie*, 742 F.3d 1058, 1063 (D.C. Cir. 2014) (listing examples), or had fled in a manner posing serious risks to the public safety – typically a vehicular flight leading to a high-speed car chase, e.g., *United States v. McClendon*, 713 F.3d 1211, 1218 (9th Cir. 2013); *United States v. Boone*, 62 F.3d 323, 324 (10th Cir. 1995).  Here, appellant's flight, on foot, did not constitute a crime or a serious risk to the public safety when compared to the cases cited by the government.[12]

Most of the exclusionary rule cases that could support the government's position are distinguishable.  *Brodie* presents the most similar factual situation and it resulted in exclusion of the evidence.  *Brodie*, 742 F.3d at 1058.  In *Brodie*, officers were waiting to execute a search warrant at the home of a murder suspect.  *Id.* at 1060.  While waiting, they saw the defendant (who was not the murder suspect) exit

---

[12] The government also argues that appellant's subsequent unlawful entry purged any taint from the earlier seizure.  We are not convinced.  Although appellant committed a new crime by entering a home only after Officer Jackson observed the gun fall, this crime does not purge any taint from the earlier seizure or its fruits.  Unlike the cases to which the government cites, recovering the gun was not "incident to" the unlawful entry.  *See Bailey v. United States*, 691 F.2d 1009, 1015 (11th Cir. 1982).  Here, because appellant's unauthorized entry occurred after he discarded the gun, it cannot logically constitute an intervening circumstance sufficient to purge the taint of the unlawful pat-down.

the home. *Id.* The officers then requested that the defendant stop and place his hands on a nearby car. *Id.* He initially complied, but shortly thereafter fled. *Id.* During his flight, he dropped three weapons. *Id.* Upon arresting the defendant, the arresting officer conducted a pat-down search and recovered crack cocaine. *Id.* The defendant moved to suppress all of the evidence, which the district court denied. *Id.* at 1060-61.

On appeal, the D.C. Circuit held that the officers' initial stop of the defendant was illegal, as it was not a valid *Terry* stop and also was not a legal seizure pursuant to an execution of a search warrant. *Id.* at 1061-62 (*citing Bailey v. United States*, 568 U.S. 186, 197 (2013)). Having determined that the initial stop was illegal, the D.C. Circuit then applied *Brown*'s attenuation test. *Brodie*, 742 F.3d at 1063. In doing so, the D.C. Circuit held that the defendant's flight did not constitute an intervening circumstance. In *Brodie*, the court reached its conclusion in part by contrasting the situation with that of the Supreme Court case, *Bailey v. United States*:

> *Bailey* contains perhaps the most analysis. The defendant engaged in forcible resistance to the seizing officers, which the court regarded as a violation of 18 U.S.C. § 111, making it a crime to forcibly resist officers of the United States going about the execution of their duties. The conclusion depended on the court's reading § 111 as withholding any defense based on the illegality of the officers' prior conduct. *Bailey*, 691 F.2d at 1018. Plainly

> we need not get into the soundness of these cases: Brodie fled on foot, and the manner of his flight in itself posed no incremental threat to anyone.
>
> As to Brodie's discard of his weapons, the *Bailey* court's treatment of a similar case is persuasive. The court noted that a defendant's tossing marijuana out a car window during an illegal stop did not constitute a new, attenuating crime: the tossing "only revealed [the] extant crime and did not itself constitute a crime." *Id.* at 1017. So here.

*Brodie*, 742 F.3d at 1063-64 (D.C. Cir. 2014). *Brodie's* rationale applies to the situation at hand: the officers' initial pat-down of appellant was illegal; that illegal pat-down precipitated appellant's flight in quick succession; appellant's flight did not pose any incremental threat to anyone.

While "we cannot condone or encourage flight from an officer every time an individual believes that the officer's conduct is unlawful[,]" *Henson*, 55 A.3d at 869-70, appellant's flight moments after the pat-down was not unlawful, as the United States twice conceded at oral argument. However, we have recognized that if an appellant believes an officer's conduct was illegal, "he should [] test[] its legality through the courts, rather than engage in self-help." *See Henson*, 55 A.3d at 869-70; *see also California v. Hodari D.*, 499 U.S. 621, 627 (1991) ("[S]ince the addressee has no ready means of identifying the deficient [police orders] it almost invariably is the responsible course to comply."). Nevertheless, we find appellant's

flight to be an insufficient intervening circumstance. In context of the attenuation doctrine's three-factor balancing test, this factor is, at worst, neutral; at best, it favors appellant.

### 3. *Purpose and Flagrancy of Misconduct*

Nor does the third factor, the purpose and flagrancy of official misconduct, operate to dispel the primary taint of the Fourth Amendment violation. The third factor of the attenuation doctrine favors exclusion when the police misconduct is most in need of deterrence – that is, when it is "purposeful or flagrant." *Strieff*, 136 S. Ct. at 2063. Although there must be something more than just a lack of reasonable suspicion to find flagrancy or purposefulness, *see Strieff*, 136 S. Ct. at 2064, we need not find that Officer Brathwaite acted in an outright threatening or coercive manner to make a finding of purposeful or flagrant misconduct. *See United States v. Burke*, 605 F.Supp.2d 688, 703 (D. Md. 2009) ("Though this behavior does not seem outrageous or patently offensive, a finding of 'purposeful and flagrant' misconduct is not limited to situations where the police act in an outright threatening or coercive manner similar to what occurred in *Brown*.") (quotations omitted). Rather, such misconduct is generally found where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely

unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up. *Brown*, 422 U.S. at 605.

In the instant case, it is undisputed that Officer Brathwaite violated appellant's Fourth Amendment rights when he lacked reasonable articulable suspicion to conduct a pat-down. In fact, the government does not challenge the trial court's finding that the officer conducted an unlawful pat-down.[13] Although Officer Brathwaite was justified in asking the passengers to exit the vehicle, he immediately sought to pat-down appellant before the officers executed a search of the car or discovered any contraband. According to Officer Brathwaite and appellant, the officer immediately began to pat-down appellant after he exited the vehicle. Such a pat-down is only constitutionally supported upon a suspicion that appellant "might be armed and dangerous"; no such articulable suspicion was present here. The officers conducted a valid traffic stop but did not offer any specific evidence that led the officers to suspect appellant, a passenger, was engaged in criminal activity. *See*

---

[13] Instead, the government asks this court to affirm the trial court's ruling based on its finding that appellant's abandonment of the firearm supports the denial of his motion to suppress. However, appellant's actions do not constitute abandonment for Fourth Amendment purposes because they were the result of an unlawful pat-down. *See, e.g.*, *Brown*, *supra*, 97 A.3d at 97 n.5.

*Robinson v. United States*, 76 A.3d 329, 331 (D.C. 2013) ("Although the reasonable, articulable suspicion threshold is low, it nonetheless requires an objective foundation both for the belief that an individual is engaged in criminal activity and, before a protective pat[-]down is conducted, for the belief that the individual is armed and dangerous."); *Singleton v. United States*, 998 A.2d 295, 300-01 (D.C. 2010) ("But even though not a demanding standard, to be 'reasonable' the suspicion must be based on facts that would have led another officer to have a similar suspicion. Moreover, to be 'articulable,' there must be specific evidence—not merely conclusions—that led the officer to suspect criminal activity in a particular circumstance.").

The record shows the obvious impropriety of Officer Brathwaite's misconduct, which alone satisfies the first part of the *Brown* test.[14] *Brown*, 422 U.S. at 605 (requiring the impropriety of the official's misconduct to be obvious or that the official knew that his conduct was likely unconstitutional but engaged in it nevertheless). Appellant and Officer Brathwaite provided conflicting versions of events as to how that transpired. Officer Braithwaite testified appellant appeared

---

[14] There is nothing in the record to indicate that Officer Brathwaite did not know the well settled law around the reasonable articulable suspicion standard. *See e.g. Robinson,* 76 A.3d at 331; *Singleton v. United States*, 998 A.2d at 300-01. He further testified that he had been an MPD officer for over three years and had "been on many traffic stops."

nervous and he wanted to ensure the safety of the public and the officers, which is why he asked and obtained implicit consent to conduct the pat-down. However, appellant denied raising his hands or consenting to a pat down. While the trial court declined to make any credibility findings regarding the officer's version of events—suggesting instead that the officer may have misremembered the sequence of the events—it found that "there is just no evidence . . . that there was any action that was consistent with the testimony of the officers."[15] *Cf. United States v. Reed*, 349 F.3d 457, 465 (7th Cir. 2003) (suggesting that purposeful conduct can arise from circumstances where "the police lack an arguable basis for the detention"), *aff'd*, 443 F.3d 600 (7th Cir. 2006).

Beyond its obvious impropriety, Officer Brathwaite's conduct was investigatory in design and purpose and was executed in the hope that something might turn up. We have repeatedly found such conduct to be purposeful where an officer undertook an unlawful search or seizure with a particular aim in mind and where that unlawful search or seizure enabled the officer to accomplish that aim. *See Green*, 231 A.3d at 414 (D.C. 2020) ("Although the violation may not have been

---

[15] "The officer's testimony in this case is that the defendant exited the car. The officer asked for permission to pat him down. The defendant raised his arms, which he took to be implicit consent, and then patted him down. . . . But what is very clear is that [his arms] are not raised in any manner."

flagrant . . . the fact remains that seizure of appellant's cell phone was a primary aim of Detective Barton's unjustified home intrusion, and it was only that violation that enabled Detective Barton to accomplish that aim"); *Jones v. United States*, 168 A.3d 703, 723 (D.C. 2017) ("Although the police officers' warrantless use of the cell-site simulator here was not flagrant misconduct, recovery of Mr. Jones's cellphone and the complainants' phones was undoubtedly one of the officers' purposes in deploying the cell-site simulator." (footnote omitted)); *Gordon v. United States*, 120 A.3d 73, 86 (D.C. 2015) ("[A]lthough the illegality was not flagrant, the officer's purpose at the time of the seizure—to check Gordon's identity through computer databases that include information about warrant status—weighs in favor of suppression.").

Here, Officer Brathwaite committed an illegal pat-down with the particular aim of finding a weapon. When asked why he wanted to pat down appellant, Officer Brathwaite testified: "They were just nervous. . . It was just to make sure he had no weapons and to make sure that that he would not be . . . any kind of danger to the public or the officers once he's outside the vehicle." *See United States v. Fernandez*, 18 F.3d 874, 883 (10th Cir. 1994) (finding that the officer's actions "had a quality of purposefulness" where the sole basis for detaining the defendant was because the officer felt that defendant was "definitely nervous" and that there was a "tension in

the air"). However, a generic concern for safety, without anything more, does not permit an officer to violate the Fourth Amendment by conducting an investigatory search. *See id*. at n.6 ("[I]f an officer lacking reasonable suspicion wishes to address his safety concerns by detaining a suspect for questioning about guns and drugs, he may attempt to do so on a consensual basis."). Officer Brathwaite's pat-down falls within that category of purposeful misconduct that is "most in need of deterrence." *Strieff*, 136 S. Ct. at 2063. The third factor of the attenuation doctrine thus fails to dispel the taint of illegality from Officer Brathwaite's conduct.

The three factors, analyzed together, weigh in appellant's favor, leading us to conclude that the primary taint of Officer Brathwaite's illegal pat-down immediately after appellant exited the car had not been purged by the time the officers found the loaded gun moments later during their pursuit of appellant. Therefore, the officers' subsequent discovery of a loaded gun must be suppressed as "fruit of the poisonous tree." The trial court erred in concluding otherwise.

## III.    Appellee's Remaining Arguments

We briefly address the government's argument that appellant lacks standing, as the trial court ruled in the alternative, because he "disavowed any possessory or

privacy interest in the gun." The government's argument conflates the "person or property searched or seized" with the "fruit" of that search or seizure. As we have noted, although "the fruit of the poisonous tree doctrine applies [] when the defendant has standing regarding the Fourth Amendment violation which constitutes the poisonous tree, *the law imposes no separate standing requirement regarding the evidence which constitutes the fruit of that poisonous tree.*" *Jones v. United States*, 168 A.3d 703, 722 (D.C. 2017) (citations omitted) (emphasis added); *see also* 6 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 11.4 (5th ed. 2016) ("If the defendant [has] standing with respect to the poisonous tree, that alone suffices.").

Furthermore, we hold that appellant did not *voluntarily* abandon the gun in the Fourth Amendment context. "In order to be effective, abandonment must be voluntary. It is considered involuntary if it results from a violation of the Fourth Amendment . . . [P]roperty is considered to have been involuntarily abandoned if the defendant discards it as a consequence of illegal police conduct." *Brown v. United States*, 97 A.3d 92, 97 n.5 (D.C. 2014) (quoting *United States v. Flynn*, 309 F.3d 736, 738 (10th Cir. 2002). Because the gun was "fruit of the poisonous tree," and because appellant's discarding of the gun resulted from the unlawful pat-down, appellant had standing to challenge its admission.

## IV.   Conclusion

Accordingly, appellant's firearm-related convictions are hereby reversed.

*So ordered.*

BLACKBURNE-RIGSBY, *Chief Judge*, concurring:  While I join the opinion of the court in full, I write separately to caution that the dual factors of "unprovoked flight" and "high crime area," outlined in *Illinois v. Wardlow*, 528 U.S. 119, 121-26 (2000), not be applied so formulaically that they become a substitute for requiring police officers to have *particularized* suspicion of an individual's suspected criminal activity prior to a lawful seizure.  Although our court has adopted and considered the *Wardlow* factors, we have also held that "more is required for officers to develop reasonable articulable suspicion of criminal activity justifying a stop" than a defendant's "presence in a high crime neighborhood coupled with his flight from uniformed officers."  *See Posey v. United States*, 201 A.3d 1198, 1203-04 (D.C. 2019).  Since the *Wardlow* decision, the United States Supreme Court has similarly

cautioned against "adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake." *Missouri v. McNeely*, 569 U.S. 141, 158 (2013) (clarifying that, in the context of *Wardlow*, there is "no valid substitute for careful case-by-case evaluation of reasonableness"). Accordingly, I simply stress that the reasonable articulable suspicion analysis should be informed by more than mere evidence of flight in a high crime area.

MCLEESE, J., *Associate Judge*, concurring: In her concurring opinion, the Chief Judge expresses the view that unprovoked flight from the police in a high-crime area does not suffice to establish reasonable articulable suspicion. For reasons that I have explained elsewhere, I believe that binding authority establishes that, to the contrary, unprovoked flight from the police in a high-crime area does suffice to establish reasonable articulable suspicion. *Miles v. United States*, 181 A.3d 633, 648 n.21 (D.C. 2018) (McLeese, J., dissenting).