Appellant, Donald Ralph Hornsby, was indicted for trafficking in cannabis, in violation of § 20-2-80, Code of Alabama 1975. After trial by jury, he was convicted for the offense charged, sentenced to eighteen years' imprisonment, and fined $25,000. He appeals, raising three issues.
On December 17, 1983, a search warrant, based upon information furnished by an informant, was obtained to search certain premises located on the farm of appellant's father, Ralph "Buck" Hornsby. Appellant lived on the farm with his parents. A search was conducted by state and county officers, pursuant to the warrant, and approximately forty-two pounds of cannabis or marijuana were discovered in a building on the farm and seized. A pistol was found in appellant's vehicle at the scene of the search, and it was seized. Both Mr. Hornsby and his son, appellant, denied any knowledge of the marijuana. The marijuana was transported to the county jail and locked in the "evidence vault." The Hornsbys voluntarily met the sheriff and the district attorney at the jail, where they were questioned separately after being advised of their Miranda rights. They continued to deny any knowledge of the marijuana; however, appellant told the officers that he had lived "off and on" in the mobile home that was one of the buildings in the search area. Appellant's father lived some distance away, and his home was not involved in the search. After questioning, appellant was charged with possession of marijuana and illegal possession of the pistol.
While appellant was in the "booking room" of the jail, he came in contact with Grady David Smith, a prisoner "trusty." Appellant stated to Smith, in "strong terms," that he would like to know who "set him up." Smith told him that he would call him the next morning and tell him who it was. Smith also mentioned that evidence had "come up missing around the jail." Appellant told Smith that he wished "this stuff to come up missing too," obviously referring to the marijuana. Apparently, no officers were present during this conversation. Appellant's testimony relating these events reflects the following:
 "A. . . . Sheriff Tice came out and he told me to come on back there and make bond, and carried me to the booking room. I think that is what they call it.
 "Q. When you went back to the booking room, who was present at that time and on that occasion?
 "A. Grady David Smith and Johnny Mac Jones [prisoners].
 "Q. Did you have any conversation with either one of those individuals back there at that time and on that occasion?
 "A. Yes, sir. I told Smith I would like to know who set me up.
 "Q. Did you say that or did you say it in a little stronger terms?
"A. A little stronger.
 "Q. All right. And what did Smith say then, if anything?
 "A. He told me that he would call me the next morning and tell me who it was, and he said that evidence had come up missing around there.
"Q. What was your reply to that?
 "A. I said, 'I wish this stuff would come up missing, too.'
 "Q. Did you have any other or further conversation with him?
 "A. Well, he told me he would call me Sunday morning and would call me collect and for me to accept the charges."
After being booked, appellant was allowed to make bond and was released. His father was not charged.
On the following morning, December 18, appellant received a telephone call from Smith, who informed him that he thought the informer in his case was Mikey Wayne Knight and that appellant should come to see him at his home the following Wednesday.
The following Wednesday, December 21, appellant went to Smith's home, where Smith and he had a further conversation concerning the informer and the marijuana. *Page 634 
Smith had a pass authorizing him to be absent from the jail. Appellant's testimony in the record pertaining to this conversation is as follows:
 "Q. Mr. Hornsby, in South Haleyville at about 5:30 p.m. on the 21st day of December, 1983, after you and Mr. Smith stepped outside, did you have a conversation with him? "A. Yes, sir.
 "Q. What, if anything, did he say to you and what, if anything, did you say to him?
 "A. He told me that Mikey Knight was the informant, and I told him I couldn't believe it, and he said what made him believe it was that Al Tidwell [district attorney] and them come and got [Knight] out of jail that Saturday morning and came back that afternoon and told him to mark him off the books.
 "Q. All right. Say anything else? Did you say anything to him at that time?
 "A. Yeah, I told him that Al and them told me if I didn't claim it that they were going to charge Daddy with it.
 "Q. And what, if anything, did Mr. Smith say to that?
"A. He said he could believe that. . . .
". . .
 "A. He said he overheard Al say he could take them four sacks of marijuana and set it down in front of any jury in Marion County and get a conviction.
 "Q. All right. Did you make any declaration to that?
 "A. I said, 'I wish that stuff wasn't there,' and he told me he would put it on some kind of truck and haul it over to Food Warehouse to an incinerator or something or slip it out and put it on there or something, and I asked him was Mikey Knight the same one that set up Roland Martin, and he said he didn't know. He said, 'Do you want me to put his stuff in there?' I told him to have at it.
 "Q. Okay. Anything further said between the two of you at that time?
 "A. He told me he would let me know when he was coming — Oh, yeah. He told me, he gave me a sob story about he didn't have any money for expense money, back and forth, and didn't have any money to buy his Christmas gifts, and I gave him $300.00.
"Q. Gave him $300.00 on that occasion?
"A. Yes.
 "Q. When did you next have some touch or contact with Grady David Smith?
"A. About four weeks later."
Four weeks later, January 18, 1984, appellant met Smith again at Smith's home, where a further discussion was held concerning the destruction of the marijuana. Appellant testified about this meeting, as follows:
 "Q. All right. After that, did you go someplace approximately four weeks later?
"A. I went up to his house.
 "Q. Did you have some conversation with him at that time and on that occasion?
"A. Yes, sir.
 "Q. What was said or done by Mr. Smith — Let me withdraw it. When you got there, do you know who was present at his home?
"A. His wife.
"Q. Did you have some conversation with him?
"A. Yes, sir.
"Q. Was it in the house or out of the house?
"A. Back out in the car.
 "Q. All right. What was said or done at that time and on that occasion?
 "A. He told me that he couldn't carry it over there and burn it. He would put it out and let the trash man haul it off, and he mentioned something about some kind of cards and records he would put in there with it. I told him to have at it, whatever.
 "Q. Was anything said about money on that occasion?
 "A. Yes. He told me that he was supposed to get out in two or three or four months and didn't know what he was going to do. He didn't have no money, and I told him, I said, 'If you do me this *Page 635 
favor, I will give you a couple of thousand.'
"Q. What did he say to that?
"A. He said he would."
It can be reasonably deduced from the record that Chief Deputy Sheriff Charles Ingram became suspicious on January 19, 1984, that there was something afoot between Smith and appellant. After answering a telephone call coming into the jail wherein the caller gave a false name and asked for Smith, Ingram confronted Smith and apparently learned of the negotiations between Smith and appellant in reference to the destruction of the evidence. Ingram testified that, prior to that time, he did not know anything about any conspiracy or arrangement to get anything out of the jail. After this confrontation with Smith, the authorities initiated the operation, with Smith's help, that resulted in appellant's second arrest for possession of the marijuana when he attempted to steal it from the jail yard.
On January 25, appellant met Smith at the county courthouse, where Smith told appellant that he was afraid to put the marijuana in the trash truck and that appellant would have to come and get it. Smith also told him that he would find a time when everyone at the jail was gone and let appellant know.
On January 27, two telephone calls were made by Smith from the jail to appellant wherein Smith gave appellant instructions on when to come to the jail and how the marijuana could be obtained. These conversations were monitored by police officers and recorded. Appellant was instructed to drive into the jail yard and park next to a white wrecked pickup truck. Smith also told appellant that he would have the marijuana in the white truck; that they would load it into appellant's vehicle; and that appellant was to deliver to Smith $2,000 in $100 bills.
The marijuana was removed from the evidence vault and placed in the white truck. It was in two large plastic bags. Appellant arrived at the appointed time, delivered the money to Smith, and he and Smith removed the marijuana from the white truck and placed it in appellant's truck. The entire transaction was observed by several officers and filmed. As appellant was about to drive away with the marijuana, he was arrested. The marijuana was seized and returned to the evidence vault.
Appellant was subsequently indicted on February 14, 1985, for trafficking in cannabis or marijuana (Case No. CC-85-26), the indictment being based upon the arrest of appellant and the seizure of the marijuana in his truck in the jail yard. We are here concerned with his conviction under this indictment. Although he was indicted for trafficking of the same marijuana (Case No. CC-84-34), arising out of the original seizure of the marijuana at the farm, he was never tried on this indictment and, as far as we can tell, the case is still pending. The pistol charge was dismissed.
 I
Appellant first contends that the trial court erred in denying his motion for a mistrial made upon the prosecuting attorney's comment that a witness was available to testify. He relies on the general rule set out in Helton v. State,433 So.2d 1186 (Ala.Cr.App.), cert. denied, 433 So.2d 1186 (Ala. 1983), that one party may not comment unfavorably on the other party's failure to produce a witness supposedly favorable to that party if the witness is equally available or accessible to both sides. The comment upon which appellant based his complaint occurred during the direct examination of appellant. The record shows the following:
 "Q. [Defense counsel]: All right. What did Smith [the trusty] say to that, if anything?
 "A. Smith said, 'I can't believe that.' He said, 'I overheard Al Tidwell [district attorney]. . . .'
 "MR. TIDWELL: Well, your honor, there again, Grady Smith is subpoenaed here as a witness. He can testify and it won't be hearsay, Your honor. If they want to call Grady Smith, that is fine."
The jury was immediately sent out of the courtroom when defense counsel requested *Page 636 
an in limine proceeding. In response to a question propounded by the court, it was revealed that both sides had subpoenaed Smith and that he was present and available to testify.
It is settled law in this state that no unfavorable inference can be drawn and no unfavorable argument to a jury made by counsel against a party to a cause because of the failure to call a witness to testify when that witness is accessible to both parties. "Available" and "accessible" are words used interchangeably. Helton v. State, supra; Brown v. State,50 Ala. App. 471, 280 So.2d 177, cert. denied, 291 Ala. 774,280 So.2d 182 (1973). Availability of a witness to one or the other of the parties is determined, first, by the party's superior means of knowing of the existence and identity of the witness and, second, by the relationship of the witness to the party that would reasonably be expected to affect the witness's personal interest in the outcome of the litigation, thus making it natural to expect or assume he would testify in favor of one party and against the other. Hunt v. State, 453 So.2d 1083
(Ala.Cr.App.), cert. denied, 453 So.2d 1083 (Ala. 1984); Millerv. State, 431 So.2d 586 (Ala.Cr.App. 1983); Brown v. State, supra.
In the case at bar, we do not interpret the comment of the prosecuting attorney as being unfavorable or as being critical of appellant's failure to call Smith as a witness. We do not even consider the comment to refer to appellant as failing to call Smith as a witness. We do not believe the jury could have so interpreted the comment. Rather, the prosecutor was objecting to hearsay and merely commenting that Smith is present and could be called to give direct testimony on the matters sought to be elicited. Smith had been subpoenaed by both sides and was available to testify. Smith was never called as a witness by either side, and the only evidence in the record of the conversations between appellant and Smith prior to their telephone conversation on the day of appellant's arrest in the jail yard comes from appellant. The jury obviously knew that Smith had been working with the State to build a case against appellant since January 18, 1984, and certainly could not be considered as a favorable defense witness. Under these circumstances, we fail to see how appellant could have been prejudiced by the prosecutor's comment. We conclude that the trial court's denial of the motion for mistrial was proper.
 II
Appellant states his next issue as follows: "If the original arrest and seizure of the contraband involved in the alleged crime is done illegally and without probable cause, can any subsequent arrests involving the same defendant and same contraband be valid?"
In addressing this issue, we first examine the record to determine the validity of the original search of the Hornsby premises on December 17, 1983, and the seizure of the marijuana found during the search. Relying on Sadie v. State,488 So.2d 1368 (Ala.Cr.App. 1986), appellant argues that the building in which the marijuana was found was not sufficiently described in the search warrant and that the officers conducting the search exceeded the scope of the warrant's description of the property to be searched, rendering the seizure illegal. The attorney general contends that, because the search warrant under attack was not introduced into evidence and made a part of the record on appeal, the issue was not preserved for our review and cannot now be used as a basis for error. Our examination of the record supports the attorney general's assertion that the search warrant was not introduced into evidence. An affidavit and search warrant not contained in the record on appeal cannot be considered on review of the trial court's ruling as to the sufficiency or any of the underlying circumstances supporting the warrant. Copeland v. State, 455 So.2d 951 (Ala.Cr.App.), cert. denied, 455 So.2d 956 (Ala. 1984). We conclude that we simply do not have sufficient facts before us from which we can determine the legality of the search and seizure. A reviewing court cannot predicate error on matters not shown by the record. Robinson v. State, *Page 637 444 So.2d 885 (Ala. 1983); Watson v. State, 398 So.2d 320
(Ala.Cr.App. 1980), cert. denied, 398 So.2d 332 (Ala. 1981), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955
(1981). Indeed, a silent record supports a judgment. Robertsonv. State, 29 Ala. App. 399, 197 So. 73 (1940), cert. denied,240 Ala. 51, 197 So. 75 (1940). It is the appellant's duty to file a correct record. Robinson v. State, supra.
Appellant also argues that his initial arrest on December 17, 1983, was not based on probable cause. Whether a warrantless arrest is constitutionally valid depends upon whether, at the moment the arrest was made, the officers had probable cause to make it. Officers are said to have probable cause to arrest if, at the moment of arrest, the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent man in believing that the subject of the arrest had committed or is committing a felony. Sexton v. State, 349 So.2d 126
(Ala.Cr.App. 1977). At the jail, appellant told the officers, during questioning and prior to his arrest, that he had lived "off and on" in the mobile home. At trial, he admitted that he told the officers this. The mobile home was in close proximity to the building in which the marijuana was found and was in the same complex of farm buildings. Considering the facts available to the officers, as shown by the record, we conclude that the officers had probable cause to arrest appellant on December 17, 1983, for trafficking in cannabis. Thus, we must conclude that there is no merit to this contention.
Nevertheless, assuming arguendo that the officers illegally arrested appellant on December 17, 1983, and that the search and seizure were invalid, we must determine whether the same marijuana seized in appellant's pickup truck in the jail yard on January 27, 1984, which he seeks to suppress, was obtained by exploitation of the initial illegal acts of the officers and should be suppressed as being a "fruit of the poisonous tree." On occasion, when the police conduct an illegal arrest or an illegal search, this will prompt the person arrested or subject to the search to react by committing some criminal offense. The person might attack the officers or attempt to bribe them or, as in the instant case, attempt to steal the evidence which was seized. See 4 W. LaFave, Search and Seizure, § 11.4(j) (2d ed. 1987). In such cases, courts are confronted with the question of whether evidence of this new crime must be suppressed as a fruit of the prior illegal arrest or search.
There is a line of cases in which courts have refused to extend the exclusionary rule to suppress evidence of independent crimes taking place as a reaction to an unlawful arrest or search. See, e.g., United States v. Bailey,691 F.2d 1009 (11th Cir. 1982), cert. denied, 461 U.S. 933,103 S.Ct. 2098, 77 L.Ed.2d 306 (1983); United States v. Turk,526 F.2d 654 (5th Cir. 1976), cert. denied, 429 U.S. 823, 97 S.Ct. 74,50 L.Ed.2d 84 (1976); United States v. Garcia, 516 F.2d 318
(9th Cir.), cert. denied, 423 U.S. 934, 96 S.Ct. 290,46 L.Ed.2d 265 (1975); United States v. Nooks, 446 F.2d 1283 (5th Cir.), cert. denied, 404 U.S. 945, 92 S.Ct. 299, 30 L.Ed.2d 261
(1971); State v. Combs, 394 N.W.2d 567 (Minn.Ct.App. 1986);State v. Saavedra, 396 N.W.2d 304 (N.D. 1986); See also 4 W. LaFave, supra, §§ 11.4(j), § 11.6(c); 1 W. Ringel, Searches Seizures, Arrests and Confessions, § 3.3 (2d ed. 1987).
In reviewing this case law, we have adopted the following analysis to dispose of the issue before us. When evidence is seized after an illegal arrest, it will be suppressed as the tainted product of the unlawful police action, unless the prosecution carries its burden of showing that the taint has been purged. Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254,45 L.Ed.2d 416 (1975); United States v. Bailey, supra. The dispositive issue is whether, granting establishment of the primary illegality, the evidence sought to be suppressed was gathered "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488,83 S.Ct. 407, 417, *Page 638 9 L.Ed.2d 441 (1963). The fruit of the poisonous tree doctrine requires a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response. The flagrancy of the police misconduct is particularly important because the purpose of the exclusionary rule is to deter police misconduct.State v. Saavedra, supra.
A sufficient causal connection to justify exclusion of the evidence is not established merely because "but for" the illegal police conduct the defendant would not have responded as he did. Three exceptions to the exclusionary rule of the "fruit of the poisonous tree doctrine" have been developed.United States v. Bailey, supra. A court may admit evidence that is the fruit of illegal police conduct if: (1) The evidence would inevitably have been discovered in the course of investigation; (2) the connection between the challenged evidence and the illegal conduct is so attenuated that it dissipates the taint of the illegal action; or (3) the evidence was obtained from a source independent of the constitutional violation. Id. at 1013.
In our instant analysis, we find the second exception to be applicable. The attenuation doctrine was first announced inNardone v. United States, 308 U.S. 338, 60 S.Ct. 266,84 L.Ed. 307 (1939), in which the Supreme Court stated that, while "[s]ophisticated argument may prove a causal connection" between information obtained through the illegal search and the challenged evidence, the court may determine that "[a]s a matter of good sense," however, the connection may have become "so attenuated as to dissipate the taint." Id. at 341,60 S.Ct. at 268. See also Segura v. United States, 468 U.S. 796,104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). In Brown v. Illinois, supra, the Supreme Court enunciated the various factors to be considered when determining whether there has been sufficient attenuation to dissipate the taint: (1) The temporal proximity between the illegality and the challenged evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.
In the instant case, from the very beginning appellant expressed an interest from the very beginning in disposing of the evidence. At Smith's suggestion that evidence had disappeared from the jail before, appellant jumped at what he perceived to be an opportunity to dispose of the evidence against him. On December 21, 1983, four days after the initial arrest, appellant and Smith reached an understanding that Smith would take the evidence from the jail and burn it, and appellant gave Smith $300 for "spending money." On that occasion, appellant asked Smith about Roland Martin, who apparently had a similar case pending against him, and when Smith asked him if he wanted him to also destroy the evidence against Martin, appellant told him to proceed. (Strangely, appellant denied any connection with Martin.) On January 18, 1984, the plans were changed. Smith agreed to have the evidence, including the records, against appellant and Martin hauled away from the jail in the trash truck, and appellant agreed to pay Smith $2,000 for the job. Up to this point, the officers were not involved and had no knowledge of what was going on between appellant and Smith. It was on the following day, January 19, that the sheriff learned of the plan to destroy the evidence and set a plan in motion whereby Smith would tell appellant that he would have to come to the jail and pick up the evidence himself. The officers, learning of the plan to steal the evidence, simply changed the plan, with Smith's aid, to afford appellant an opportunity to come to the jail and get the evidence himself, which he obviously was eager to do. The facts here do not give rise to an entrapment defense. The defendant, in effect, concedes this in his brief. Appellant and Smith placed the marijuana in appellant's truck, appellant paid Smith the $2,000, and, as appellant was about to drive away, he was arrested and the marijuana was seized.
We hold that these actions so attenuated the chain of causation between the original search and arrest and the search and arrest in the jail yard as to dissipate the taint of the original illegal action. Evidence from the subsequent search and arrest cannot *Page 639 
realistically be treated as fruit of the original search and arrest. The evidence supporting appellant's conviction for trafficking in cannabis resulted from his own willful acts, not from an exploitation of the prior allegedly illegal search, seizure, and arrest. Instances of attempts by accused persons to steal and dispose of the evidence against them are rare indeed and could hardly be counted on by the police to resurrect an otherwise invalid search or arrest. Sound public policy dictates that the law should discourage and deter the incentive on the part of accused persons to commit other new and separate crimes, especially the likes of the crime committed in this case. We are not confronted here with any suggestion that the officers generated or intentionally provoked appellant's commission of the offense in the jail yard as a pretext to provide an independent, legitimate basis for the prior illegal search and arrest. The record does not support any such contention.
We hold that probable cause existed for the arrest of appellant on January 27, 1984, in the jail yard; that the search of his truck incident to that arrest was reasonable; and that the marijuana seized in that search was admissible in evidence. The trial court did not err in refusing to suppress the evidence.
 III
Last, appellant contends that "the trial court erred in not concluding as a matter of law based upon due process considerations that defendant was innocent of the charge on which he was tried." Appellant apparently is arguing that the facts underlying his conviction are insufficient as a matter of law to constitute the offense of trafficking. He argues that he may be guilty of some other offense, but not trafficking. He contends that his purpose in attempting to obtain the marijuana was to destroy it, not to traffic in it. We, of course, have no sure way of knowing what he intended to do with it once he got it away from the jail; however, whatever he intended to do with it was irrelevant in establishing his guilt under the charge. The State proved each essential element of the offense of trafficking, § 20-2-80. The trial court's denial of appellant's motion for a judgment of acquittal was proper.
For the foregoing reasons, the judgment of the court below is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.