496 S.E.2d 135

**Welford V. WASHINGTON**

v.

**COMMONWEALTH of Virginia.**

**Record No. 0230–96–2.**

Court of Appeals of Virginia,
Richmond.

Feb. 24, 1998.

Patricia P. Nagel, Assistant Public Defender (David J. Johnson, Public Defender, on brief), for appellant.

Kathleen B. Martin, Assistant Attorney General (James S. Gilmore, III, Attorney General, on brief), for appellee.

Present: BENTON and ANNUNZIATA, JJ., and COLE, Senior Judge.

BENTON, Judge.

Welford V. Washington was convicted of possession of heroin and possession of cocaine. *See* Code § 18.2–250. Contending that he was illegally seized and that the police unlawfully entered his home, Washington argues that the trial judge erred in denying his motion to suppress. We agree and reverse his convictions.

## I.

The evidence proved that on August 30, 1995, a bondsman telephoned Officer Michael Moore and asked Officer Moore to meet him at the 2000 block of Mecklenburg Street. Officer Moore testified that the bondsman received a tip from an informant that Reginald Ford, for whom a capias had been issued, could be found at 2347 Bethel Street. Officer Moore testified that he verified that a capias was outstanding, that he did not obtain a copy of the capias, and that he believed Ford "had either jumped or was about ready to jump [bail]."

Officer Moore also testified that he had not checked to determine Ford's address and did not have a physical description of Ford. Only the bondsman could recognize Ford.

At 10:30 a.m., Officer Samuels and Sergeant Kemp met Officer Moore and the bondsman at 2347 Bethel Street, Washington's residence. Officer Samuels testified that he was told that Ford "was supposed" to be in the residence. He knew only Ford's name. He did not have a physical description of Ford, and he had no information concerning the capias. He had not been told that Ford was dangerous, but he testified that he "take[s] everybody to be dangerous."

Officers Samuels and Kemp went to the back door of Washington's residence. Officer Moore and the bondsman went to the front door. Officer Moore knocked on the front door for a "[c]ouple of minutes." Moore did not see anybody look out of a window.

Officer Samuels testified that he heard Officer Moore knocking on the front door. Three to four seconds after the knocks began, Washington opened the back door and stepped out. Officer Samuels testified that Washington opened the door "rather fast." Samuels placed his hands on Washington and said, "Mr. Ford." Washington replied, "[N]o. I'm Welford Washington." Officer Samuels then frisked Washington and asked Washington for identification. Washington said his driver's license was inside the residence and turned to go inside. Officer Samuels went into the house in front of Washington. Officer Kemp followed. When Officer Samuels entered the kitchen, he saw "syringes with cocaine and heroin" residue and baggies of white powder and he arrested Washington. Ford was not in the residence.

Washington contended the officers unlawfully entered his residence without a search warrant in violation of the Fourth Amendment. The trial judge denied the motion to suppress the seized evidence.

## II.

To justify a *Terry* stop, a "police officer must be able to point to specific and articulable facts which, taken together

with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). When a stop is based on an informant's tip, the "informant must provide some basis for his knowledge [of the facts he reported] before the police officer relies upon it as being reliable enough to support an investigatory stop." *Beckner v. Commonwealth,* 15 Va.App. 533, 537, 425 S.E.2d 530, 533 (1993). In addition, "[s]ignificant aspects of the informer's information must be independently corroborated . . . to give 'some degree of reliability to the . . . allegation' of the informant." *Bulatko v. Commonwealth,* 16 Va.App. 135, 137, 428 S.E.2d 306, 307 (1993) (quoting *Alabama v. White,* 496 U.S. 325, 332, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301 (1990)). On appeal, we review *de novo* the trial judge's determination that reasonable suspicion existed to stop Washington. *See Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996).

■ We hold that the police officers lacked a reasonable suspicion that Ford was at 2347 Bethel Street, that Washington was Ford, or that Washington was engaging in criminal activity. The evidence proved that Washington resided at 2347 Bethel Street. The police learned from the bondsman that an unidentified informant said Ford could be found at that address. No evidence established the basis of the unknown informant's asserted knowledge that Ford could be found at Washington's residence. Moreover, no evidence established that either the informant or the bondsman was a reliable informant. Indeed, none of the officers attempted to corroborate the tip by determining Ford's address or by determining who resided at 2347 Bethel Street. Because neither the informant's reliability nor the basis for the informant's knowledge was established, the officers lacked a reasonable suspicion to believe that Ford was in the residence at 2347 Bethel Street. *See McGee v. Commonwealth,* 25 Va.App. 193, 203, 487 S.E.2d 259, 264 (1997) (*en banc*). *See also State v. Rubert,* 46 Or.App. 843, 612 P.2d 771 (1980).

Officer Samuels lacked a reasonable suspicion to believe that Washington was Ford. The uncontroverted testimony of Officer Samuels and the other officers established that none of the officers had a physical description of Ford. Officer Samuels simply speculated that Washington might be Ford. The uncorroborated, unsubstantiated informant's tip was not enough, alone, to provide Officer Samuels with reasonable suspicion to believe that any man who was in the residence was Ford. Furthermore, Washington promptly identified himself to Officer Samuels by stating that his name was Welford Washington.

■ Finally, the fact that Washington opened the rear door of the residence after Officer Moore knocked on the front door is insufficient to justify a stop of Washington. No evidence proved that the officers announced their presence or that Washington knew the police were at the door. Washington testified that he opened the rear door because he believed the knock was at that door. Even if Officer Samuels suspected that Washington intended to flee, "flight alone may not supply sufficient reason to suspect a person of criminal activity." *Buck v. Commonwealth*, 20 Va.App. 298, 303, 456 S.E.2d 534, 536 (1995). Washington's appearance at the rear door could give rise "to no more than an 'inchoate and unparticularized suspicion or "hunch" ' " about his intention. *Deer v. Commonwealth*, 17 Va.App. 730, 736, 441 S.E.2d 33, 37 (1994) (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883). In the absence of any particular information, Officer Samuels lacked a reasonable articulable suspicion that Washington, when he opened the door, was involved in a criminal offense or that he was armed and dangerous.

"Th[e] demand for specificity in the information upon which police action is predicated is the central teaching of [the United States Supreme] Court's Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 21 n. 18, 88 S.Ct. at 1880 n. 18. Based upon the scant information provided by the informant, we hold that Officer Samuels lacked a reasonable suspicion to believe that Ford could be found at 2347 Bethel Street, that

Washington was Ford, or that Washington was involved in a criminal offense. Accordingly, the stop and frisk of Washington was unlawful.

## III.

■ Citing *Barnes v. Commonwealth*, 234 Va. 130, 360 S.E.2d 196 (1987), the Commonwealth further argues that the officers had a "limited authority to enter [Washington's residence] pursuant to the capias." We disagree. Even if the police had been armed with an arrest warrant for Ford and had a reasonable basis to believe he was in the residence, they still would have needed a search warrant to lawfully enter Washington's residence to arrest Ford. "[T]he entry into a home [of a person not named in an arrest warrant] to . . . make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a [search] warrant." *Steagald v. United States*, 451 U.S. 204, 211, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981).

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a [person] to retreat into his [or her] own home and there be free from unreasonable governmental intrusion." In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York*, 445 U.S. 573, 589–90, 100 S.Ct. 1371, 1381–82, 63 L.Ed.2d 639 (1980) (citation omitted). Thus, "to the extent that [an arrest warrant] is invoked as authority to enter the homes of third parties," that entry is violative of the

Fourth Amendment rights of those third parties. *Steagald,* 451 U.S. at 220, 101 S.Ct. at 1652.

 The Commonwealth further argues that Officer Samuels' entry into the residence was justified because of "the potential for danger." No evidence supports that argument. We reiterate that the officers had no information that Washington's home was Ford's residence. Officer Samuels justified his entry on the grounds that he "needed to know who [Washington] was" and that he considers "everybody to be dangerous." However, Washington identified himself to Officer Samuels. Even if Officer Samuels had a legitimate need to verify Washington's assertion that he was not Ford, a less intrusive means was available. The bondsman, who could identify Ford, was on the scene.

 In addition, Officer Samuels lacked a reasonable basis to conclude that Washington was dangerous. Nothing about Washington indicated that he posed a danger to the officers. Officer Samuels' generalized belief that everyone is dangerous did not allow him to enter Washington's residence at his whim. Furthermore, it is clear that "any exigency arising from [Washington's] retreat was created solely by the police action in knocking on [Washington's] door." *State v. Morse,* 125 N.H. 403, 480 A.2d 183, 186 (1984). "Where agents create the exigency themselves, warrantless activity is per se unreasonable and we require suppression of any evidence obtained thereby." *United States v. Webster,* 750 F.2d 307, 328 (5th Cir.1984). *See also United States v. Rosselli,* 506 F.2d 627 (7th Cir.1974) (agents knocking at apartment door and identifying themselves as police officers unnecessarily created emergency situation).

Because Officer Samuels was not justified in stopping Washington in the first instance, his entry into Washington's house and search of the kitchen cannot be justified by an apprehension of fear that arose during the stop. *Cf. Servis v. Commonwealth,* 6 Va.App. 507, 519, 371 S.E.2d 156, 162 (1988) ("Once an officer has *lawfully* stopped a suspect, he is 'authorized to take such steps as [are] reasonably necessary to protect [his

and others'] personal safety ....") (quoting *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985) (emphasis added)). Thus, the entry and search of Washington's house was a product of the illegal detention and the fruits should have been suppressed. *See Walls v. Commonwealth*, 2 Va.App. 639, 651, 347 S.E.2d 175, 182 (1986).

For these reasons, we reverse the trial judge's refusal to suppress the evidence.

*Reversed and remanded.*

COLE, Judge, dissenting.

I respectfully dissent. The trial judge based his decision upon the presence of exigent circumstances sufficient to permit the police officers to enter Washington's home without a search warrant. I would affirm the trial court because of the presence of exigent circumstances. I also disagree with the majority's assertion that the police officers could not stop Washington to determine his identity as he fled from the police through the rear door of his home to avoid the police.

On August 30, 1995, Officer Michael Moore was operating a patrol car. At 10:15 a.m., he received a call directing him to meet a bondsman from Henderson Bonding in the 2000 block of Mecklenburg Street concerning a possible location of a wanted party named Reginald Ford. Moore met with the bondsman, Mr. Henderson, who advised Moore that he had received a tip from a reliable informant as to Ford's location. He stated that Ford was at 2347 Bethel Street. Officer Moore verified through the warrant section of the police department that a capias was outstanding for Reginald Ford. At trial, Moore testified that Ford "had either jumped or was about ready to jump bond." Henderson was the bondsman "who had bonded out" Ford. Henderson asked the help of the police to take Ford into custody.

In addition to the authority of the capias, the police officers and Henderson had extensive powers over Ford conferred upon them by Code § 19.2–149, which provides, in pertinent part:

A surety on a bond in a recognizance may at any time arrest his principal and surrender him to the court before which the recognizance was taken or before which such principal's appearance is required, or to the sheriff, sergeant or jailer of the county or city wherein the court before which such principal's appearance is required is located; in addition to the above authority, upon the application of the surety, the court, or the clerk thereof, before which the recognizance was taken, or before which such principal's appearance is required, shall issue a capias for the arrest of such principal, and such capias may be executed by such surety, or his authorized agent, or by any sheriff, sergeant or police officer, and the person executing such capias shall deliver such principal and such capias to the sheriff or jailer of the county or the sheriff, sergeant or jailer of the city in which the appearance of such principal is required. . . .

It is undisputed that a capias was outstanding for Reginald Ford on the ground that he had jumped or was about to jump bond. A capias is a court order that requires the officer to whom it is addressed to take a named defendant into custody. *See Black's Law Dictionary* 208 (6th ed. 1990). Officer Samuels testified at trial that at the time of this incident, he was not aware whether the capias was based upon a felony or a misdemeanor, but he later determined it was upon a felony. Any person charged with a felony who willfully fails to appear before any court as required is guilty of a Class 6 felony, and any person charged with a misdemeanor who willfully fails to appear as required is guilty of a Class 1 misdemeanor. *See* Code § 19.2-128(B).

"A valid arrest warrant carries with it the implicit but limited authority to enter the residence of the person named in the warrant in order to execute the warrant, where there is 'reason to believe' that the suspect is within." *United States v. Route,* 104 F.3d 59, 62 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 2491, 138 L.Ed.2d 998 (1997); *see also Payton v. New York,* 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980); *United States v. Woods,* 560 F.2d 660, 665 (5th

Cir.1977), *cert. denied,* 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 497 (1978).

In *Wallace v. King,* 626 F.2d 1157 (4th Cir.1980), *cert. denied,* 451 U.S. 969, 101 S.Ct. 2045, 68 L.Ed.2d 348 (1981), the United States Court of Appeals for the Fourth Circuit held that, in order for a search to be "constitutionally valid, not only must the officers have probable cause to believe the person named in the arrest warrant is on the premises of the third person, but there must also exist an appropriate exception to the warrant requirement, e.g., ... exigent circumstances." *Id.,* 626 F.2d at 1161. The Court identified a nonexclusive list of circumstances justifying such an entry without a search warrant, noting, *inter alia,* that "[e]xigent circumstances may properly include hot pursuit or justifiable fear of injury to persons or property if the arrest is delayed." *Id.*

Under the facts of this case, the officers had a "reason to believe" that Ford was present at 2347 Bethel Street. Officer Moore met Mr. Henderson, a professional bondsman with Henderson Bonding Company, who advised Moore that he had received a tip from a reliable informant that Ford could be found at 2347 Bethel Street. Because Ford had jumped or was about to jump bail, it was essential that the officers react immediately to the situation.

Based upon the authority of the capias, the authority of Code § 19.2–149, and the fact that they had reason to believe Ford was located in the house, Moore and the bondsman went to 2347 Bethel Street intending to execute the capias and take Ford into custody. There they were met by Officer Samuels and Sergeant Kemp to aid in the arrest. The time of arrival was 10:30 a.m.

Officer Moore and the bondsman went to the front door, and Samuels and Kemp went to the rear door. Moore knocked on the door several minutes. Samuels, at the rear door, heard the knocking on the front door. Within three to four seconds after the knocking commenced, the back door opened and Washington stepped out. Samuels testified as follows:

Q. Describe the manner in which he came out?

A. He didn't know we were there. He was opening the door rather fast. I placed my hands on him. I said, Mr. Ford, and he said, no, I'm Welford Washington.

I patted him down and asked him if he had any identification on him, and he said no.

Q. What, if anything, did he do next?

A. He said that his driver's license was on the kitchen table. He turned to go into the house, and I went in in front of him, for safety's sake, and his driver's license was on the kitchen table, along with the drug paraphernalia that we recovered. All of it was in plain view.

\* \* \* \* \* \*

Q. What were your safety concerns in stepping into the house first?

A. I didn't know whether or not he was Reginald Ford or Welford Washington. I didn't know if Reginald Ford was in the house. I didn't know if there was a gun laying on this kitchen table, or if he was going to open the door, and go in, and slam the door, and then we have got a barricaded suspect to confront.

Q. Why didn't you let him walk in first and you behind him?

A. He would have been able to access a gun on the kitchen table or anywhere else in the house. He could have first took off running through the whole house. It's too dangerous.

Assuming, but not deciding, that stopping Washington in this manner to seek his identification constituted a seizure, as the majority holds, Officer Samuels had specific and articulable facts sufficient to justify the seizure. The majority appears to proceed upon the theory that the seizure was based upon the informant's tip. In this case, the officers were executing a capias to take Ford into custody. The bondsman was present and had statutory authority to arrest Ford. The officers had reason to believe that Ford was located at 2347 Bethel Street. This information was obtained from a reliable

informant. This informant did not give any information about whether Ford had, or was about to engage in any criminal activity. He provided the address where Ford could be found. The bondsman and Officer Moore, who verified the validity of the capias, had full knowledge about Ford's identification, description and criminal activity. The majority states that "[e]ven if the police had been armed with an arrest warrant for Ford and had a reasonable basis to believe he was in the residence, they still would have needed a search warrant to lawfully enter Washington's residence to arrest Ford." I disagree. To support this statement, the majority quotes from *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980), in which the United States Supreme Court held: "Absent exigent circumstances that threshold may not reasonably be crossed without a warrant." The clear implication to be drawn from this statement is that with exigent circumstances, the threshold may reasonably be crossed without a warrant.

When Washington exited the rear door, he gave Officer Samuels reasonable suspicion to believe he was Ford and was exiting the premises to evade the police. Samuels heard Moore knocking on the front door, and Washington testified that he also heard the knocking at the front door. Washington did not answer the knock at the front door, but rapidly exited through the rear door three to four seconds after the knocking began.

The officers reasonably could infer from the evidence that, because no one knocked on the rear door, Washington was fleeing the premises. Officer Samuels testified that, from the manner Washington exited, it appeared he did not know the officers were present. Washington rapidly exited the door and "stepped out" of the house. Viewing the evidence in the light most favorable to the Commonwealth, the trial judge could infer that Washington heard the knocking at the front door and fled through the rear door to evade the police because of the presence of drugs and drug paraphernalia on the kitchen table.

Under the circumstances, Samuels reasonably believed that Washington was Ford and that he was fleeing the premises to avoid being taken into custody under the capias or being arrested by the bondsman at the front door. Under these circumstances, Samuels was able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted stopping Washington to conduct a further investigation. *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). Therefore, if stopping Washington to determine his identification under these circumstances was a Fourth Amendment seizure, then Samuels had sufficient specific and articulable facts to justify the stop, contrary to the conclusion reached by the majority opinion.

In the trial court, Washington argued that no exigent circumstances existed to permit the police to cross the threshold of the home. This is the issue upon which the trial judge decided the case. The majority has avoided this issue. Exigent circumstances exist where "there is a likelihood that the occupants will attempt to escape, resist, or destroy evidence." *United States v. Jackson,* 585 F.2d 653, 662 (4th Cir.1978). In this case, a capias had been issued by a judicial officer to take Ford into custody because he had jumped bond or was about to jump bond, thus avoiding his trial. Officers must instantly determine whether exigent circumstances exist, and they are forced to act on incomplete clues as to what will unfold when they seek to effectuate an arrest. *See Bonner v. Anderson,* 81 F.3d 472, 476–77 (4th Cir.1996) (Wilkinson, C.J., dissenting). When an arrest arises while the police are in the field investigating the conduct which is the basis for the arrest, there should be a far greater reluctance to fault the police for not having a search warrant. *See* 2 Wayne R. LaFave, *Search and Seizure* § 6.1(f) (3d ed. 1996).

The Supreme Court of Virginia has adopted the following principle regarding exigent circumstances:

Exigent circumstances ... may justify as reasonable a warrantless entry into a dwelling, a search of the interior, a

seizure of contraband, and an arrest of those found in possession of it. Such warrantless entries into dwellings, followed by searches, seizures, and arrests therein, however, are presumed to be unreasonable, in Fourth Amendment terms, casting upon the police a heavy burden of proving justification by exigent circumstances.

*Verez v. Commonwealth,* 230 Va. 405, 410, 337 S.E.2d 749, 752–53 (1985) (citations omitted).

In *Verez,* the Court put forth the following noncomprehensive list of factors and situations that may justify a warrantless entry based upon exigent circumstances:

(1) the degree of urgency involved and the time required to get a warrant; (2) the officers' reasonable belief that contraband is about to be removed or destroyed; (3) the possibility of danger to others, including police officers left to guard the site; (4) information that the possessors of the contraband are aware that the police may be on their trail; (5) whether the offense is serious, or involves violence; (6) whether officers reasonably believe the suspects are armed; (7) whether there is, at the time of entry, a clear showing of probable cause; (8) whether the officers have strong reason to believe the suspects are actually present in the premises; (9) the likelihood of escape if the suspects are not swiftly apprehended; and (10) the suspects recent entry into the premises after hot pursuit.

*Id.* at 410–11, 337 S.E.2d at 753. In determining whether exigent circumstances sufficiently "overcome the presumption of unreasonableness and justify a warrantless entry, the Court must examine the circumstances as they reasonably appeared to the law enforcement officers on the scene. 'The officers are not required to possess either the gift of prophecy or the infallible wisdom that comes only with hindsight.' " *Id.* at 411, 337 S.E.2d at 753 (citation omitted).

In this case, Officer Samuels explained why he crossed the threshold of the residence, namely, he had reason to believe that Ford was present in the home. Ford had a reason to escape from the police. He had shown that he did not want to

submit to the law, and, as a result, a capias had been issued for his arrest. Within seconds of Officer Moore's knock on the front door, a person rapidly exited through the rear door. Samuels inquired if he was Ford, and the person responded that he was Welford Washington. However, he possessed no identification.

At this point, Samuels did not know whether he was talking to Ford or Washington. Having reason to believe that appellant might be Ford, who was escaping from the lawful authorization of the capias and attempting to avoid arrest, and who, in the act of fleeing, might be armed and dangerous, Samuels patted down Washington and asked him for some identification. I believe Samuels' actions were reasonable. At trial, Samuels explained that he did not know whether he was facing Ford or Washington; he did not know if a gun was in the kitchen, or whether appellant was going to slam the door and barricade himself in the house. Under these circumstances, when Washington turned and started back into the house without explaining what he was doing, Samuels was justified in entering the house because of the exigent circumstances. Almost all of the exigencies enumerated in *Verez* were present. Samuels acted reasonably when he stepped in front of Washington and went into the kitchen, where he saw the identification, as well as the illegal contraband on the kitchen table in plain view. Under the circumstances that reasonably appeared to Samuels, he acted reasonably and was justified in entering the house under these exigent circumstances.

The trial judge commented upon the evidence as follows:

At that point, Mr. Washington makes known to Officer Samuels his identification as being Welford Washington, rather than Reginald Ford. He indicates, in effect, that he has no identification on his person, and that his identification is on the kitchen table, and bearing in mind that he just came out of the rear door of the house.

At that point, there is no precise testimony that Mr. Washington said I will go in and get it. But there was the

comment from Officer Samuels that Mr. Washington started back into the house, presumably to get the identification.

Under those circumstances, . . . the options of the police officer may have been to detain Mr. Washington while the police officers went down and requested a warrant from the magistrate to enter the premises for the purpose of locating Mr. Reginald Ford, order permitting Mr. Washington to go into the house to obtain the identification, which he indicated was in the kitchen, to satisfy Officer Samuels that Mr. Washington, indeed, was not Mr. Reginald Ford.

When Mr. Washington elected to go into the house to acquire that, under those exigent circumstances, the Court finds no fault in Officer Samuels accompanying him into the house, and the fact that Officer Samuels went into the house, into the back door, in front of Mr. Washington does not change the Court's perception that it was a limited intrusion.

In the trial court, Washington argued that no exigent circumstances existed to permit the police to cross the threshold of the home. This is the issue upon which the trial court decided the case. The majority has avoided this issue by saying that the exigency was created by the police when they knocked on the front door. This argument lacks merit. We must look at the facts in the light most favorable to the Commonwealth, the prevailing party. The exigency was created when Washington fled from the premises through the rear door when the police knocked on the front door. Had he answered at the front door and identified himself as Washington, this case may never have occurred.

I find that, upon the circumstances of this case, that exigent circumstances justified Samuels' action when he stepped into the rear door in front of Washington in order to secure Washington's identification. Therefore, I would affirm the trial court's finding of exigent circumstances and affirm its denial of the motion to suppress.