140

# CIRCUIT COURT OF FAIRFAX COUNTY

Commonwealth of Virginia

v.

Keith D. Davis

June 30, 2000

Case No. (Crim.) 97651

By Judge Stanley P. Klein

On May 26, 2000, Defendant Keith D. Davis moved this court to suppress evidence of events which took place in his residence on January 24, 2000. Davis contends that the police entered his home on January 24th in violation of the Fourth Amendment and thus, all fruits of their entry, including the subsequent events occurring therein, must be suppressed pursuant to *Wong Sun v. United States* and its progeny. See *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); see also *Harrison v. United States*, 392 U.S. 219, 20 L. Ed. 2d 1047, 88 S. Ct. 2008 (1968); *Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975); *Segura v. United States*, 468 U.S. 796, 82 L. Ed. 2d 599, 104 S. Ct. 3380 (1984).

The Commonwealth responds, *inter alia*, that the entry was not unlawful as a result of the "hot pursuit" and "exigent circumstances" exceptions to the Fourth Amendment's warrant requirement. The Commonwealth further argues that even if there was an illegal entry, events which are criminal in nature flowing from the entry are not properly subject to the exclusionary rule.

The Court has considered the testimony of the witnesses, its findings as to the credibility of their testimony, the relevant authorities, and the arguments of counsel. For the reasons set forth herein, the Motion to Suppress is denied.

## I. *Background*

On January 24, 2000, Davis was conducting a voluntary hunger strike in his home. Lieutenant Thomas Trapp of the Fairfax County Police Department (FCPD) testified that he and other law enforcement personnel had been aware of Davis' hunger strike for weeks. At 5:15 p.m. on January 24, 2000, a Fairfax Magistrate issued a Temporary Detention Order (TDO) for Davis,[1] and a Temporary Detention and/or Mental Health Assessment hearing was scheduled for January 26, 2000.

Beginning around 7:00 p.m. and continuing until some time before 10:00 p.m. on January 24th, members of the FCPD tactical unit ("Tactical Unit") met to discuss the logistics of serving the TDO on Davis. According to Lt. Trapp, a number of high-level law enforcement officers, including captains, were involved in this discussion; however, no one person was placed in charge. Lt. Trapp also testified that the Tactical Unit members consulted with mental health personnel regarding the situation, yet no testimony identified these professionals or indicated how these professionals had obtained their information on Davis' situation. Lt. Trapp further testified that the unidentified mental health professionals believed that the defendant may have had a firearm, but did not know for certain that he would be armed. Lt. Trapp indicated that he understood the defendant was likely to be hostile to any law enforcement efforts to end his hunger strike and that Davis would consider the police to be vigilantes if they came to his residence.

The Tactical Unit nevertheless planned a police operation to seize Davis that evening, pursuant to the TDO. Although there was more than ample time

---

[1] A Temporary Detention Order may be issued pursuant to § 37.1-67.1 of the Virginia Code, which provides the following: "A magistrate may, upon the sworn petition of any responsible person or upon his own motion, and only after an in-person evaluation by an employee of the local community services board or its designee who is skilled in the assessment and treatment of mental illness and who has completed a certification program approved by the Department, issue an order of temporary detention if it appears from all evidence readily available, including any recommendation from a physician treating the person or from a clinical psychologist treating the person, that the person is mentally ill and in need of hospitalization and that the person presents an imminent danger to self or others as a result of mental illness, or is so seriously mentally ill as to be substantially unable to care for self, and the person is incapable of volunteering or unwilling to volunteer for treatment. Such order may include transportation of the person to such other medical facility as may be necessary to obtain emergency medical evaluation or treatment prior to placement."

to do so, they never sought to obtain a search warrant for the residence in question. Nor did they seek the assistance of persons living at the residence or mental health professionals, who may have been able to aid the Tactical Unit's efforts to gain entry to the residence or to otherwise induce Davis into leaving the residence. In fact, according to the evidence, no mental health professionals or negotiators were part of the planned operation.

At approximately 10:00 p.m. that night, Lt. Trapp, dressed in civilian clothes, knocked on the outer door of Davis' residence while other members of the Tactical Unit hid behind bushes a few feet from the door. Davis responded to Trapp's knocking on the front door and opened the screen door but at all times stood within his residence. Lt. Trapp tried to lure Davis from the home by telling him that he had been involved in an accident with a car parked in front of the townhouse.

Within those same moments, Officer Pearson, one of the Tactical Unit members positioned in front of the house, claimed he lost sight of Davis at the door. Pearson testified that he made some noise as he moved to get a better view, thus causing Davis to look in his direction. Then, for some reason totally unknown to this Court, Officer Pearson charged towards the door of the residence. Neither officer testified regarding any furtive movements by Davis; nor was any evidence presented that Lt. Trapp was in any danger. In fact, nothing indicated that Davis had threatened Trapp or had acted in any hostile manner.

Pearson was dressed all in black with a vest that Pearson said had "Police" written on it. He also testified that he wore a badge on his upper body. No evidence was presented by the Commonwealth, however, regarding (1) whether the then existing lighting conditions provided sufficient visibility to see any markings of police authority; (2) whether Davis, or anyone else, could have had the time to determine that either Trapp or Pearson was a police officer in the one to two seconds that elapsed between Pearson's move for the door and his warrantless entry into the residence; or (3) whether either Trapp or Pearson at any time announced that he was a police officer.

As Pearson ran up the steps toward the door, Trapp attempted to grab hold of Davis' shirt but Davis broke free and retreated further within the residence. Pearson testified that he followed eight to ten feet behind Davis and saw Davis reach to get a gun. Pearson called out "gun" and shortly thereafter heard a shot coming from the area to which Davis had been running. Pearson testified that he then saw Lt. Thompson go down the hall towards Davis. He followed Lt. Thompson who fired and shot Davis with "less lethal shot." Davis was then taken into custody and charged with assaulting a police officer.

## II. *Analysis*

The Commonwealth agrees that Davis had a reasonable expectation of privacy within his residence. The burden, therefore, is on the Commonwealth to provide a justification for the entry into the residence. Davis argued on brief that the TDO is not the equivalent of a warrant and the Commonwealth has not disputed this legal assertion, either on brief or at oral argument.

If the TDO does not constitute the equivalent of a warrant, then the United States Supreme Court's decision in *Payton v. New York*, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1979), controls. In *Payton*, the Supreme Court held that, absent exigent circumstances, a warrantless entry of a residence violates the dictates of the 4th Amendment. *Payton*, 445 U.S. at 590.[2] The Court noted that "the physical entry of the home is the chief evil against which the wording of the 4th Amendment is directed." *Payton*, 445 U.S. at 585 (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 32 L. Ed. 2d 752, 92 S. Ct. 2125 (1972)).

If the TDO does constitute the functional equivalent of a warrant, myriad cases from the United States Supreme Court and the Virginia appellate courts require that, absent exigent circumstances, the police must knock and announce *before* entering a residence, even when armed with a warrant.[3] Here,

---

[2] The absence of alleged criminal activity does not obviate the necessity of obtaining a warrant. See *Camara v. Municipal Court*, 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967); cf. *Treasury Employees v. Von Raab*, 489 U.S. 656, 675, 103 L. Ed. 2d 685, 109 S. Ct. 1384 (1989) (concluding that administrative searches are reasonable under the Fourth Amendment); *New York v. Burger*, 482 U.S. 691, 716-717, 96 L. Ed. 2d 601, 107 S. Ct. 2636 (1987) (discussing Fourth Amendment challenges to administrative searches); *New Jersey v. T.L.O.*, 469 U.S. 325, 339, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985) (upholding the administrative search of a student's purse in a school); *Mosher Steel v. Teig*, 229 Va. 95, 99, 327 S.E.2d 87 (1985) ("Because administrative searches are significant intrusions on interests protected by the Fourth Amendment, they may be conducted only where justified by probable cause."); *Abateco Services, Inc. v. Bell*, 23 Va. App. 504, 512, 477 S.E.2d 795 (1996) (stating that the United States Supreme Court has recognized an exception to the warrant requirement solely for administrative searches of closely regulated businesses and industries).

[3] See *Miller v. United States*, 357 U.S. 301, 308-09, 2 L. Ed. 2d 1332, 78 S. Ct. 1190 (1958); *Heaton v. Commonwealth*, 215 Va. 137, 138, 207 S.E.2d 829 (1974); *Wynne v. Commonwealth*, 15 Va. App. 763, 765, 427 S.E.2d 228 (1993); *Commonwealth v. Viar*, 15 Va. App. 490, 493-94, 425 S.E.2d 86 (1992); *Gladden v. Commonwealth*, 11 Va. App. 595, 598, 400 S.E.2d 791 (1991).

it is uncontroverted that the police forcibly entered Davis' residence without knocking and announcing.

The Commonwealth advances two arguments to support the Tactical Unit's warrantless entry into the residence, the "hot pursuit" exception and the "exigent circumstances" exception.

## A. *"Hot Pursuit" Exception*

The Commonwealth, relying on the U.S. Supreme Court decision in *United States v. Santana*, asserts the entry was warranted under the doctrine of "hot pursuit." The Commonwealth's reliance on *Santana* is misplaced. First, in *Santana*, the police followed a person into a residence who was suspected of the commission of a criminal offense. See *United States v. Santana*, 427 U.S. 38, 49 L. Ed. 2d 300, 96 S. Ct. 2406 (1976); see also *Warden v. Hayden*, 387 U.S. 294, 18 L. Ed. 2d 782, 87 S. Ct. 1642 (1967). In *Welsh v. Wisconsin*, 466 U.S. 740, 80 L. Ed. 2d 732, 104 S. Ct. 2091 (1984), the United States Supreme Court expressly declined to extend the hot pursuit doctrine to allow a warrantless entry of a residence to apprehend a person suspected of a civil forfeiture offense.[4] Similar to the scenario in *Welsh*, here, there was no cause to believe that Davis had committed a felony or was committing a misdemeanor at the time of the police entry on January 24, 2000.

Second, in *Santana*, the Supreme Court noted that the defendant was standing in the doorway. "One step forward would have put her outside and one step backward would have put her in the vestibule of her residence." 427 U.S. at 40, n. 1. Likewise, in *Warden*, the police chased the suspect from a public area into the residence. 387 U.S. at 297-98. In this case, the Commonwealth's own evidence establishes that Davis never stepped outside the confines of his residence, as Lt. Trapp himself testified that Davis stood inside as he talked to him.

The Commonwealth also argues that the opinion in *Santana* supports the proposition that once an occupant of a house can be seen from the outside through an open door, the police are thereby authorized to follow him into the house under the "hot pursuit" exception. If this Court were to accept the Commonwealth's position, it would render meaningless the entire body of law requiring the police to knock and announce their presence before effecting entry into a residence. Mere visual contact with a suspect would thereby be

---

[4] Under Wisconsin law, DWI constituted a civil forfeiture offense. See *Welsh v. Wisconsin*, 466 U.S. 740, 80 L. Ed. 2d 732, 104 S. Ct. 2091 (1984).

sufficient to allow a forcible, unannounced police entry of a home. The Court expressly rejects this argument and finds that the doctrine of "hot pursuit" fails to provide a legal justification for the entry into the residence of the defendant.

## B. *"Exigent Circumstances" Exception*

The Commonwealth next argues that the entry was justified by the "exigent circumstances" exception to the warrant requirement rule. "Warrantless entries into dwellings, followed by searches, seizures and arrests therein, however, are presumed to be unreasonable, in Fourth Amendment terms, casting upon the police a heavy burden of proving justification by exigent circumstances." *Verez v. Commonwealth*, 230 Va. 405, 410, 337 S.E.2d 749 (1985). Moreover, where the police themselves create the exigency, the warrantless activity is *per se* unreasonable and the evidence obtained as a result thereof must be suppressed. See *Washington v. Commonwealth*, 26 Va. App. 657, 664, 496 S.E.2d 135 (1998); see also *United States v. Webster*, 750 F.2d 307, 328 (5th Cir. 1984); *United States v. Rosselli*, 506 F.2d 627 (7th Cir. 1974).

Here, any exigent circumstances were created by the police themselves. Initially, they had more than sufficient time to obtain a warrant between 7:00 p.m. and the time they decided to approach Davis' residence. In addition, purportedly to attempt to save the life of a man on a hunger strike, the police decided to send their Tactical Unit to Davis' residence at a time when the defendant would probably still be awake. There was no evidence that these highly trained officers ever considered other available means to get the defendant out of his home or to allow them to effect a peaceable entry at a time when the defendant could not possibly represent a threat to them. Instead, a member of the Tactical Unit, for less than legally sufficient reasons, decided to burst into a personal residence, the place where the Fourth Amendment's protections are held most sacrosanct, without a warrant and without knocking and announcing.

Over forty years ago, the United States Supreme Court noted that "the requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application." *Miller v. United States*, 357 U.S. 301, 313, 2 L. Ed. 2d 1332, 78 S. Ct. 1190 (1958). Almost forty years ago, the Virginia Supreme Court explained the purposes underlying the knock and announce rule as follows:

> The reasons for the requirement of notice of purpose and authority
> have been said to be that the law abhors unnecessary breaking or

destruction of any house, because the dweller in the house would not know the purpose of the person breaking in, unless he were notified, and would have a right to resist seeming aggression on his private property.

*Johnson v. Commonwealth*, 213 Va. 102, 104, 189 S.E.2d 678 (1972). The Virginia Court of Appeals has also recognized that compliance with the rule "discourages violence and volatile confrontations and encourages orderly executions of search warrants." *Hargrave v. Commonwealth*, 21 Va. App. 320, 323, 464 S.E.2d 176 (1995).

In the Court's view, the Tactical Unit's plan on January 24, 2000, was ill-conceived and executed in a manner which gave little, if any, consideration to the requirements of the Fourth Amendment.[5] The salutary purposes underlying the knock and announce rule were virtually ignored as the police decided on a course of action that created the exact type of emergency situation that the knock and announce rule was intended to avoid. This is of particular concern here in Virginia where it generally remains legal to possess a firearm. Many citizens exercise their right to bear arms and fervently believe that it is appropriate to utilize such firearms to protect themselves from criminals who may attack them in their homes. This Court holds that the actions of the Tactical Unit on January 24, 2000, were violative of the requirements of the Fourth Amendment to the United States Constitution.

## C. *Fruit of the Poisonous Tree Analysis*

Based upon the "fruit of the poisonous tree" doctrine enunciated in *Wong Sun v. United States*, 371 U.S. 471, 480, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963), Davis asserts that all events which flowed from the unlawful police entry of his residence must be suppressed. Davis, however, cites no authority in support of the argument that *events* can be suppressed. The issue of whether

---

[5] Unfortunately, this is not the first instance in which Virginia tribunals have expressed concern about the actions of the Tactical Unit. See, e.g., *Park v. Commonwealth*, 32 Va. App. 407, 528 S.E.2d 172 (2000). More than one judge of the Fairfax County Circuit Court bench has reluctantly concluded that some members of the Tactical Unit consider the Fourth Amendment to be a distraction they need to work around rather than a requirement of the United States Constitution. There is in fact no Fairfax County Police Department Tactical Unit exception to the Fourth Amendment and this judge has no intention of explicitly or implicitly creating such an exception.

the suppression of events falls within the breadth of the exclusionary rule appears to be one of first impression in the Commonwealth.

The exclusionary rule initially barred only the introduction at trial of tangible physical objects and documents. *Wong Sun*, 371 U.S. at 485. In *Wong Sun*, the Supreme Court expanded the scope of the rule to include verbal statements. The Court reasoned that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officer's action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Id.* Relying on its decision in *Silverthorne Lumber v. United States*, 251 U.S. 385, 64 L. Ed. 319, 40 S. Ct. 182 (1920), the Court reiterated that the intended reach of the exclusionary rule extended to both the direct and indirect products of unlawful police action. See *Wong Sun*, 371 U.S. at 484-85.

Not all evidence however, constitutes tainted fruit "simply because it would not have come to light *but for* the illegal actions of the police." *Wong Sun*, 371 U.S. at 488 (emphasis added); see also *Warlick v. Commonwealth*, 215 Va. 263, 266, 208 S.E.2d 746 (1974). As Davis conceded on brief, the United States Supreme Court and Virginia's appellate courts have explicitly recognized three exceptions to the fruit of the poisonous tree doctrine: (1) where the discovery of the evidence can be attributed to an independent source[6]; (2) where the connection to the illegal police action has "become so attenuated as to dissipate the taint"[7]; and (3) where the evidence would inevitably have been discovered even without the unlawful police conduct.[8] In addition, the United States Supreme Court has held that the decision whether to invoke the exclusionary rule may vary depending on the nature of the evidence to be suppressed. *United States v. Ceccolini*, 435 U.S. 268, 55 L. Ed. 2d 268, 98 S. Ct. 1054 (1980). In *Ceccolini*, the Court undertook an attenuation analysis and reversed the decision of the Court of Appeals for the Second Circuit, which had suppressed the testimony of a witness whose knowledge of the defendant's criminal activity had been made known to the police through an improper search. In so ruling, the Supreme Court held as follows:

---

[6] See Silverthorne Lumber v. United States, 251 U.S. 385, 392, 64 L. Ed. 319, 40 S. Ct. 182 (1920).

[7] Nardone v. United States, 308 U.S. 338, 341, 84 L. Ed. 307, 60 S. Ct. 266 (1939).

[8] See United States v. Crews, 445 U.S. 463, 470, 63 L. Ed. 2d 537, 100 S. Ct. 1244 (1980); see also Warlick v. Commonwealth, 215 Va. at 266; Commonwealth v. Ealy, 12 Va. App. 744, 755, 407 S.E.2d 681 (1991).

> The exclusionary rule *should be invoked with much greater reluctance* where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object.

*Id.* at 280 (emphasis added). It is within the framework of the above precedent that this Court must decide whether the reach of the exclusionary rule will extend to the events which took place inside Davis' residence on January 24, 2000, after the initial illegal police entry.

Davis urges this Court to apply a simple "but for" analysis in its application of the fruit of the poisonous tree doctrine, i.e., but for the unlawful police entry, the shooting events that followed never would have taken place. For overriding reasons of public policy, this Court declines to so extend the breadth of the exclusionary rule. If the court were to accept the Defendant's position, its analysis could support an argument that any person subjected to unconstitutional police action has the unfettered right to use deadly force against the police in response thereto. Establishment of such an unfettered right to use deadly force could escalate everyday encounters into deadly confrontations. Improper police stops of vehicles could lead to gun fights on our highways, whether the unlawfulness of the stop was real or merely perceived. Unconstitutional police entries or arrests, effected in good faith, could lead to unpunishable murders of law enforcement officers. This Court expressly rejects the defendant's proposed bright-line "but for" analysis because it could potentially countenance unthinkable acts of violence against the police and immunize the individuals who perpetrate them.

Further, more than strong public policy supports the Court's decision not to so extend the breadth of the exclusionary rule. Although not yet explicitly recognized by either the United States Supreme Court or Virginia's appellate courts, a "distinct crime" exception to the fruit of the poisonous tree doctrine has been embraced by various federal and state courts across the country. See *United States v. King*, 724 F.2d 253, 256 (1st Cir. 1984) (holding that the defendant's retaliatory gun fire in response to an unlawful police search constituted "an independent intervening act which purged the taint of the prior illegality"); *United States v. Nooks*, 446 F.2d 1283 (5th Cir. 1971) (declaring that the new crime of resistance sufficiently attenuated the fruits of the search from the original arrest); *State v. Indvik*, 382 N.W.2d 623 (N.D. 1986) (finding that the defendant's acts of fleeing from the police and drawing and shooting his firearm dissipated the taint of the initial and illegal police stop); *State v. Miskimins*, 435 N.W.2d 217, 221 (S.D. 1989) (holding that the causal

connection between home entry and acts of defendant broken by defendant's assaultive conduct, relying on *United States v. Bailey*, 691 F.2d 1009 (11th Cir. 1982)); *People v. Klimek*, 101 Ill. App. 3d 1, 427 N.E.2d 598, 603, 56 Ill. Dec. 403 (1981) (ruling that the unlawful conduct of defendant after unconstitutional police action admissible); *State v. Miller*, 282 N.C. 633, 194 S.E.2d 353, 357-358 (1973) (ruling that the evidence of the murder of a police officer effecting illegal entry admissible); *State v. Aydelotte*, 35 Wash. App. 125, 665 P.2d 443, 447-448 (1983) (ruling that the evidence of crimes committed against police officers after entry admissible); *State v. Burger*, 55 Ore. App. 712, 639 P.2d 706, 708 (1982) (holding that the illegal warrantless entry cannot immunize subsequent criminal activity); *State v. Gaffney*, 36 Ore. App. 105, 583 P.2d 582, 584 (1978) (holding that the exclusionary rule did not apply to evidence of independent crimes directed at police after unlawful police action); cf. *Commonwealth v. Saia*, 372 Mass. 53, 360 N.E.2d 329, 332 (1977) (assuming initial illegality of entry, suppression denied because no showing exists of exploitation of primary illegality). In dicta, the Virginia Supreme Court has approvingly cited the Eleventh Circuit's decision in *United States v. Bailey*. See *Woodson v. Commonwealth*, 245 Va. 401, 406, 429 S.E.2d 27 (1993) ("Police may arrest for 'new, distinct crime' by defendant in response to unlawful police conduct").

Pursuant to this exception, if a person engages in new and distinct criminal acts after unlawful police conduct, "the new crime purge[s] the taint of the prior illegal [conduct]," *United States v. Sprinkle*, 106 F.3d 613 (4th Cir. 1999),[9] and evidence of the new crime is admissible. The United States Court of Appeals for the 11th Circuit has articulated the rationale underlying the distinct crime exception, opining that "[a] contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *United States*

---

[9] In *United States v. Sprinkle*, the police discovered that the defendant possessed a firearm immediately following an investigative stop. The stop was declared unconstitutional because no reasonable articulable suspicion justified it. However, Sprinkle's motion to suppress evidence of his firearm, which was granted by the district court, was reversed and the case was remanded with instruction to reinstate the indictment because Sprinkle's use of the gun constituted a new distinct crime. Even though the police stop was improper, Sprinkle's intervening illegal act, fleeing the police and then drawing and firing his gun at them, made the gun admissible. "If a suspect's response to an illegal stop is itself a new distinct crime, then the police constitutionally may arrest the suspect for that crime." *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) (citing *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982)) (punctuation altered).

*v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982) (finding that to extend the fruits doctrine to new crimes gives a defendant "an intolerable *carte blanche* to commit further criminal acts" and at a cost too high for society to pay for deterring police misconduct). "Notwithstanding a strong causal connection in fact between lawless police conduct and a defendant's response, if the defendant's response is a new, distinct crime, then the police constitutionally may arrest the defendant for that crime." *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982) (punctuation omitted).

Davis argues that the "distinct crime" exception is inapplicable here because the cases that have adopted it are founded on the proposition that a citizen has no right to resist an unlawful arrest, while Virginia law authorizes an arrestee to defend against an unlawful arrest. See *Brown v. Commonwealth*, 27 Va. App. 111, 116-17, 497 S.E.2d 527 (1998) (holding that arrestee can use reasonable force to defend against an unlawful arrest); see also *Smith v. Commonwealth*, 30 Va. App. 737, 740, 519 S.E.2d 831 (1999); *Foote v. Commonwealth*, 11 Va. App. 61, 69, 396 S.E.2d 851 (1990). The Court disagrees. In fact, Davis only had the right to use reasonable force to repel the initial attempted seizure of his person. *Smith*, 30 Va. App. at 740, 519 S.E.2d 831; *Brown*, 27 Va. App. at 117; *Foote*, 11 Va. App. at 69. The question of what constitutes reasonable force is reserved for the trier of fact at trial. If the trier of fact determines that the force utilized by Davis on January 24, 2000, was excessive, then his actions "purged the taint of the prior illegal [entry]" and the exclusionary rule should not be invoked. *Sprinkle*, 106 F.3d at 619. If the trier of fact determines that the force utilized by Davis to resist the unlawful attempt to seize him was reasonable, he will necessarily be found not guilty and the suppression issue will be rendered moot. This Court therefore rejects Davis' contention that the "distinct crime" exception is inapplicable and adopts this exception to the fruit of the poisonous tree doctrine under the factual circumstances of this case.

For the reasons set forth above, this Court declines to extend the scope of the exclusionary rule to encompass criminal acts against police officers who are effecting unconstitutional searches or seizures. Accordingly Davis' Motion to Suppress is denied.